**John Rella ADAMS, et al., Appellants,**

v.

**PETRADE INTERNATIONAL, INC., et al., Appellees.**

**No. 01–86–00526–CV.**

Court of Appeals of Texas, Houston (1st Dist.).

March 17, 1988.

Rehearing Denied July 7, 1988.

Raymond E. White, Akin, Gump, Strauss, Hauer & Feld, Van E. McFarland, McFarland & Tondre, Houston, for appellants.

Larry R. Veselka, Vinson & Elkins, Albert Vacek, James L. Reed, Looper, Reed, Weing & McGraw, Houston, Jerome P. Owens, Woodville, Sim T. Lake, Fulbright & Jaworski, Houston, for appellees.

Before EVANS, C.J., and LEVY and HOYT, JJ.

EVANS, Chief Justice.

John R. Adams, d/b/a Adams Oil Company, and Cloyce K. Box appeal from a money judgment in favor of Petrade International, Inc. and Gulf States Oil and Refining Company, based on the jury's findings that Box and Adams agreed to purchase certain gasoline from Petrade and Gulf States and that the parties were also bound by the terms of a settlement agreement.

In May 1979, gasoline and No. 2 grade fuel oil were bringing in the highest price in history. In early June 1979, Box, Adams, and Petrade, a trading company, began discussions about a purchase of gasoline and No. 2 oil from Petrade. The jury found that Box and Petrade's representatives agreed that Petrade would sell 100,000 barrels of regular gasoline and 100,000 barrels of No. 2 fuel oil, which, at Box's request, were to be shown as having been purchased in Adams' name. Adams verbally confirmed this purchase, and later agreed to purchase an additional 100,000 barrels of regular gasoline from Petrade.

After Petrade confirmed that it could purchase the gasoline and oil from its supplier, Gulf States, Petrade sent "confirmation" documents to Adams, the legal effect of which is a substantial issue in the case.

After initially agreeing to delivery of the oil on Colonial Pipeline at Pasadena, Texas, Adams asked that the oil be scheduled instead on the Texas Eastern Pipeline, which could route the oil to where Adams had a potential customer. But because the Texas Eastern Pipeline could handle delivery of only 25,000 barrels of the oil in June, the delivery of the remaining oil was delayed. This delay was confirmed by the parties' writings in June 1979.

In mid-June 1979, prices of gasoline and No. 2 oil suffered a severe decline. On July 2, Petrade's representatives met with Adams and Box to discuss their arrangement. At that meeting, Adams executed a written agreement acknowledging his agreement to purchase the No. 2 oil, but he verbally informed Petrade that he needed more time to pay for it. Box and Adams denied any agreement to buy the gasoline.

After further negotiations, Box and Petrade's representative orally agreed to a settlement concerning the No. 2 oil purchase agreement. Under this settlement, Box's company, OKC Corporation, was to buy 100,000 barrels of No. 2 oil from Petrade for later delivery, at a price in excess of the then-prevailing market price; in return, Petrade was to release Box from liability. Adams, on the other hand, was to pay Petrade the sum of $1.3 million dollars, and Petrade would release Adams from liability. Also, Box and Adams would not be required to take delivery of or pay for oil from Petrade under the June 1979 agreement.

A written settlement agreement, stating that Adams would pay $1.3 million for a release of any liability on the No. 2 oil contract, was prepared and sent by Adams' lawyer to Petrade. There was evidence that this writing accurately reflected the terms of the agreed settlement. On July 16, Petrade received a revised settlement agreement from Adams requiring that Pe-

trade also release Adams from his alleged obligation under the outstanding gasoline agreements. Petrade refused to do so. As a result, neither Box nor Adams paid Petrade for any of the gasoline or for the No. 2 oil. Petrade's supplier, Gulf States, then demanded adequate assurance of performance on the gasoline that Petrade had agreed to buy in order to fulfill Adams' contract, and it refused to deliver either the gasoline or the prepaid No. 2 oil without security of $10 million.

OKC Corporation later purchased 100,-000 barrels of No. 2 oil from Petrade at a price in excess of the prevailing market price (as provided by the settlement agreement), but Adams never paid Petrade the $1.3 million that was specified in the settlement agreement as the consideration for a release of his liability. Neither did Petrade expressly release Box or Adams of liability under the No. 2 oil purchase agreement. No oil or gasoline was ever delivered to Box and Adams, and this litigation resulted.

The cause was tried to a jury, which found: that Box and Adams were partners, and that Adams was Box's authorized agent in negotiating the agreements to buy gasoline and oil, and also in making the oil settlement agreement; that Adams had orally agreed to purchase the gasoline and oil from Petrade; that Adams had anticipatorily repudiated his agreement to purchase 200,000 barrels of regular gasoline and breached his agreement to purchase 100,000 barrels of No. 2 oil; that the market price per gallon of gasoline, both at the time of the repudiation and at the time of tender, was $.96 per gallon and that the market price at the time and place of tender of the No. 2 oil was $.91 per gallon; that Petrade tendered to Adams all of the gasoline and No. 2 oil he had agreed to purchase; and that Box was liable as guarantor of Adams' obligation under the gasoline agreements. The jury favorably answered a series of issues relating to the enforceability of the gasoline agreements under the theory of promissory estoppel, and also found that Petrade was a merchant for purposes of an exception to the statute of frauds section of the Texas Business and Commerce Code.

The jury further found that Box and Adams had entered into the settlement agreement with Petrade regarding the No. 2 oil transaction; that the terms of such agreement were that Box or OKC would purchase 100,000 barrels of No. 2 oil from Petrade at $.80 per gallon, and that Adams would pay Petrade $1.3 million in settlement of the claims against him. The jury refused to find that there had been a failure of consideration by Petrade with respect to any of the agreements, or an impossibility of such performance, or that the parties intended that payment for the gasoline and oil would be made only upon receipt of supporting documents.

After motions for judgment and for judgment notwithstanding the verdict, the trial court awarded Petrade and Gulf Coast $2,898,000 as damages against Box and Adams, jointly and severally, on the gasoline contracts. This figure apparently represents the difference between the contract and the market price of the gasoline. Judgment was also entered against Adams alone for $1.3 million, the amount that Adams had agreed to pay under the settlement agreement. The court also awarded prejudgment interest and attorney's fees, and entered a take-nothing judgment as against Box's Company, OKC.

Box and Adams together assert 149 points of error, grouped into parts for purpose of argument.

We first address the appellants' contention that Petrade's recovery under the alleged gasoline purchase contracts was barred by the statute of frauds. The Texas statute of frauds provides:

(a) Except as otherwise provided in this section a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a

term agreed upon but the contract is not enforceable under this paragraph beyond the quantity of goods shown in such writing.

(b) Between merchants if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the requirements of Subsection (a) against such party unless written notice of objection to its contents is given within ten days after it is received.

. . . .

Tex.Bus. & Com.Code Ann. sec. 2.201 (Tex. UCC) (Vernon 1968).

Box and Adams contend, in essence, that the two alleged gasoline contracts: (1) are unenforceable as a matter of law under Texas UCC section 2.201(a), and (2) do not satisfy the merchant's exception to the requirements of 2.201(a), because "no writing in confirmation" was timely sent. Sec. 2.201(b). The appellants also contend that the court erred in submitting to the jury numerous special issues relating to elements of the statute of frauds issues; but these contentions are not argued, so they are waived. Appellants also assert that there was no evidence or insufficient evidence to support the jury's findings relating to these issues.

Section 2.201 of the Texas U.C.C. requires a signed writing sufficient to indicate that a contract for sale has been made. Tex.Bus. & Com.Code Ann. sec. 2.201(a). The appellees concede that no such writing signed by the appellants exists, but contend that the circumstances of this case fall within the "merchant's exception" to the statute of frauds.

The "merchant's exception" provides, insofar as applicable here, that between merchants, a writing in confirmation of the contract will satisfy the requirements of section 2.201(a) if (1) it is received within a reasonable time, (2) it is sufficient against the sender, and (3) the party receiving it has reason to know its contents. Tex.Bus. & Com.Code Ann. sec. 2.201(b). Such a confirmation satisfies section 2.201(a) unless written notice of objection is given within 10 days after the confirmation is received. *Id.*

■ Whether the circumstances of a particular case fall within an exception to the statute of frauds is generally a question of fact. *Vehle v. Brenner*, 590 S.W.2d 147, 152 (Tex.Civ.App.—San Antonio 1979, no writ). Thus, it is usually for the jury to decide whether the parties were merchants, whether the writing was sent within a reasonable time, and whether the party receiving it had reason to know its contents. But if the writing itself does not, as a matter of law, constitute a confirmation, then the "merchant's exception" in section 2.201(b) does not apply, and the contract is subject to the statute of frauds.

■ Here, the writing sent by Petrade, purportedly in confirmation of the alleged agreement to purchase gasoline, read as follows:

This confirms arrangements made between Mr. Steven Wyatt and Mr. J.R. Adams concerning the transaction described below in which PETRADE sells J.R. Adams Oil Company the following:

| | |
|---|---|
| PRODUCT: | Regular Gasoline |
| QUANTITY: | Approximately 200,000 barrels |
| DELIVERY: | July, 1979, Via Colonial Pipeline |
| PRICE: | $1.305 per U.S. Gallon, F.O.B. Pasadena, Texas |
| TERMS: | Immediate wire transfer of funds upon presentation of invoice |
| INSPECTION: | N/A |
| OTHER DETAILS: | 1) For origin points north of Pasadena, Texas, J.R. Adams Oil Co. agrees to pay current Colonial Pipeline Tariffs. 2) Pipeline tickets to govern final quantity. |

If this is in accord with your understanding, please sign and return one (1) copy of this confirmation for our files.

ACCEPTED _____, 1979 _____

By _____

PETRADE INTERNATIONAL, INC.

By _____ [initials] _____

It is undisputed that neither Box nor Adams ever signed the acceptance portion of this writing, and the only question is

whether it constituted a confirmation within the meaning of section 2.201(b).

The appellants, Box and Adams, contend that this writing was merely an offer, and not a confirmation, because (1) it inquired whether the stated terms were in accordance with Adams' understanding; (2) it instructed Adams to sign and return a copy if the stated terms did express his understanding; and (3) because it contained a blank signature line that was never signed. Appellants also contend that the writing contains terms that were never discussed and that were at variance with prior discussions, as well as with the industry's standard terms.

Appellants argue that a letter that requires some further action on the part of the recipient to show acceptance, cannot be a confirmation of a prior oral contract and, instead, merely constitutes an offer. In support of this assertion, appellants cite *Great Western Sugar Co. v. Lone Star Donut Co.*, 567 F.Supp. 340 (N.D.Tex.), *aff'd*, 721 F.2d 510 (5th Cir.1983), which involved a writing similar to the one here. In that case, the document provided: "This letter is a written confirmation of our agreement. Please sign and return to me the enclosed counterpart of this letter signalling your acceptance of the above agreement." The court held, as a matter of law, that because the letter required a response, it was merely an offer, and not a confirmation, so it did not satisfy the merchant's exception to the statute of frauds.

We first look to the writing to determine whether the intent of the contracting parties is unambiguously expressed. If a writing is unambiguous, its construction is a legal matter to be determined by the court. *Myers v. Gulf Coast Minerals Management Corp.*, 361 S.W.2d 193, 196 (Tex. 1962). On the other hand, if the language in the writing is reasonably capable of conflicting interpretations, it is ambiguous, and extrinsic evidence may be considered to ascertain the writing's true meaning and the parties' intent. *See Great Western Sugar Co. v. White Stokes Co.*, 736 F.2d 428, 430 (7th Cir.1984).

There is language in the letter that indicates that it is a confirmation, i.e., "This confirms arrangements made ... concerning the transaction described below...." But, as appellants correctly point out, whether a writing labels itself a "confirmation" is not determinative of that question. *See Great Western Sugar Co. v. Lone Star Donut Co.*, 721 F.2d 510.

Despite the use of the word "confirmation" in the body of the writing, we conclude here, as a matter of law, that there is unambiguous language in the writing that precludes a construction that it was a confirmation of a prior oral contract. The writing specifically states that *if* the stated "arrangements" were "in accord" with Adams' understanding, that Adams was to *sign* and to *return* one copy of the letter to Petrade. There followed, in capital letters, the word "ACCEPTED" and a blank signature line for compliance with these instructions.

These components of the letter clearly required further action by Adams, and we therefore hold, in agreement with the rule stated in *Great Western Sugar Co. v. Lone Star Donut*, that the writing was only an offer, and not a confirmation of a prior oral contract. The following language in the *Great Western Sugar Co. v. Lone Star Donut* case is applicable here:

> By requiring the buyer to take further action in order to signal acceptance (signing and returning a copy of the letter agreement), [seller] indicated to the buyer ... that the terms quoted were still subject to acceptance or rejection rather than representing a memorialization of an oral contract. *A true confirmation requires no response.* Having presented [the buyer] with a renewed opportunity to weigh the benefits of a bargain and escape it, [the seller] cannot rely on the ... letter agreement to satisfy the requirements of the statute of frauds.

567 F.Supp. at 342 (emphasis added).

Although the official commentary to section 2.201 indicates that no specific words are required to confirm an oral contract, we refuse to hold that section 2.201(b) is satisfied by a writing that is clearly condi-

tional upon further acceptance by the buyer. We accordingly sustain the appellants' points of error asserting that any alleged oral contract was unenforceable under the statute of frauds. Because of the disposition of those points, we do not reach appellants' points of error that assert other bases for the alleged contract's invalidity under the statute of frauds.

We next move to a consideration of whether the judgment may, nevertheless, be upheld under the doctrine of promissory estoppel. Appellants argue that the trial court did not enter judgment on this basis, because the damages awarded far exceeded those found by the jury in response to special issues inquiring about promissory estoppel. The appellants further argue that even if the judgment was entered or could be upheld on the theory of promissory estoppel, there was no evidence or insufficient evidence to support judgment on that theory.

■■■ Under the doctrine of promissory estoppel, a promise may be binding if the promisor should reasonably expect that the promise will induce action or forbearance, the promise does in fact induce such action or forbearance, and the enforcement of the promise is necessary to avoid injustice. *"Moore" Burger, Inc. v. Phillips Petroleum Co.*, 492 S.W.2d 934, 937 (Tex.1972); *First State Bank v. Schwarz Co.*, 687 S.W.2d 453, 455 (Tex.App.—Dallas 1985, writ ref'd n.r.e.). Thus, the elements of promissory estoppel require proof of: (1) a promise, (2) foreseeability that the promisee would rely on the promise; and (3) substantial reliance by the promisee to his detriment. *English v. Fischer*, 660 S.W.2d 521, 524 (Tex.1983). Although promissory estoppel is normally a defensive theory, it may be asserted by a plaintiff as an affirmative ground for relief. *Donaldson v. Lake Vista Community Improvement Ass'n*, 718 S.W.2d 815, 818 (Tex.App.—Corpus Christi 1986, writ ref'd n.r.e.).

We first address the issue of whether the doctrine of promissory estoppel may be asserted to avoid the strict requirements of the statute of frauds under Tex.Bus. & Com.Code section 2.201. Although that section enumerates several exceptions to its requirement of a writing, it does not contain an exception based upon promissory estoppel. Tex.Bus. & Com.Code Ann. sec. 2.201. Section 1.103 of the Code provides generally that principles of law and equity, including estoppel, shall supplement, but not displace, the provisions of the Code. Adams argues that because certain exceptions to section 2.201 are specifically enumerated, the Code provisions displace the judicially created equitable remedy of promissory estoppel.

■■■ Contrary to Adams' assertion, Texas courts have held that the doctrine of promissory estoppel may be asserted against the requirements of the statute of frauds. *See Kenney v. Porter*, 604 S.W.2d 297, 303 (Tex.Civ.App.—Corpus Christi 1980, writ ref'd n.r.e.); *H. Molsen & Co. v. Hicks*, 550 S.W.2d 354, 356 (Tex.Civ.App.—El Paso 1977, writ ref'd n.r.e.); *John H. Pelt Co. v. American Casualty Co.*, 513 S.W.2d 128 (Tex.Civ.App.—Dallas 1974, writ ref'd n.r.e.). But those courts have also held that the remedy is limited to those cases in which the complaining party relied on an oral promise to furnish a written contract that complied with the statute of frauds. *Id.* Thus, a party asserting the doctrine of promissory estoppel against the statute of frauds must not only satisfy the requirements of the doctrine, but must also show that the promisor either misrepresented that the statute of frauds had been satisfied, or promised to sign a written agreement. *Id.; see "Moore" Burger, Inc.*, 492 S.W.2d at 937.

■■■ Here, Adams claims that the record does not contain: (1) any evidence that he promised to sign the writing that was eventually sent; (2) any proof of reliance on such a promise; (3) any showing of foreseeability that Petrade would suffer injury, and (4) any evidence reflecting substantial injury to Petrade as a result of the breach. Appellant Box contends that there is no evidence or insufficient evidence to support the jury's finding of (1) detrimental reliance or (2) estoppel damages.

In deciding "no evidence" points, we consider only the evidence and inferences tend-

ing to support the finding, and if there is any evidence of probative force to support the finding, the point must be overruled. *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965); *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660 (1951). In determining "factual insufficiency" points, we review all of the evidence, both supporting and against the challenged finding; if the finding is so against the great weight and preponderance of the evidence as to be manifestly erroneous, the point will be sustained. *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660; *M.J. Sheridan & Son Co. v. Seminole Pipeline Co.*, 731 S.W.2d 620, 623 (Tex.App.—Houston [1st Dist.] 1987, no writ).

The jury found that Box promised to buy 100,000 barrels of gasoline and that Adams agreed to buy 200,000 barrels of gasoline from Petrade. The jury also found that Adams promised to sign a writing reflecting his promises, intending to induce Petrade to act or refrain from acting. Further, the jury found that Petrade reasonably and detrimentally relied on Adams' promises. These findings are supported by Steve Wyatt's testimony of his negotiations with Adams.

Wyatt testified that on June 4, 1979, Adams agreed to buy 200,000 barrels of gasoline and 100,000 barrels of fuel oil from Petrade. Wyatt stated that he discussed the price per 100,000 barrels, as well the time and place of delivery, first with appellant Box, then also with appellant Adams, on the telephone. Wyatt testified that after the terms had been agreed upon, he asked for Adams' Telex number, so that he could transmit a confirmation, but that Adams said he had no Telex. Wyatt testified that he then said he would send written contracts by mail, and that Adams agreed to sign them and send them back. The writings were not sent out until June 11, after the market price for gasoline had begun to drop sharply. Adams did not sign and return them. Wyatt testified that he called Adams about four days later, when he did not receive the signed contracts back, and that Adams told him that he had received the fuel oil contract but not the gasoline contracts to sign. Wyatt testi-

fied that they were sent in the same envelope. He told Adams he would send him another copy, and Adams again said he would sign and return the contracts. In subsequent conversations, according to Wyatt, Adams also assured Petrade that financing would be no problem for the oil and gasoline purchases. When asked repeatedly about signing the gasoline contracts, Adams told Wyatt that he would sign them.

Although Petrade, before the transaction with Adams, had already agreed to buy 100,000 barrels of gasoline from its supplier, Gulf States, there was testimony that Petrade agreed to purchase a second 100,000 barrels of gasoline only in reliance upon Adams' alleged agreement with Petrade. Tracy Dubose, one of Petrade's founders and its majority shareholder, testified that because Petrade was a small company in a volatile market, it would also have promptly sold the first 100,000 barrels that it purchased from Gulf States, if there had been no transaction with Adams. Dubose testified that Petrade did not attempt to sell the 200,000 barrels of gasoline to anyone else, because it already had committed the gasoline to the transaction with Adams.

Although there was other testimony that contradicted this evidence, the jury, as the trier of fact, was entitled to judge the credibility of the witnesses, to accept or reject any part of the evidence, and to resolve any conflicts in the evidence. *Rego Co. v. Brannon*, 682 S.W.2d 677, 680 (Tex. App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.). We find that the evidence is sufficient to support the jury's finding that there was a promise to buy the gasoline and a further promise to put the agreement in writing, as well as the foreseeability of Petrade's reliance. We also find there is legally and factually sufficient evidence to support the jury's finding that Petrade relied on the promises. We accordingly hold that the trial court's determination of the appellants' liability can be upheld on the theory of promissory estoppel, and we overrule Box's and Adams' promissory estoppel points of error.

Because of this holding, we need not reach Box's points of error 12 and 17 through 25, relating to Petrade's contract claims. We also do not address Adams' point of error 4, which is premised on Petrade's contract claim.

We next turn to the issue of damages.

■ It is settled law that a party's damages based on promissory estoppel are "not measured by the profits that such party's reliance led him to expect, but instead are limited to the amount necessary to compensate that party for a loss already suffered." *Sun Oil Co. v. Madeley*, 626 S.W.2d 726, 734 (Tex.1981); *Wheeler v. White*, 398 S.W.2d 93, 97 (Tex.1965) (the injured party is to be compensated for his foreseeable, definite reliance, the damages to be measured by the detriment sustained). We reject Petrade's assertion that contract/market price damages constitute the proper measure of promissory estoppel damages here. Thus, the question presented is whether there are findings, which are supported by legally and factually sufficient evidence, to sustain a judgment for the appellees for reliance damages.

In connection with the promissory estoppel issues, the trial court conditionally submitted special issue number 18, to which the jury found that the sum of $409,231 would adequately compensate Petrade for any damages caused by its reliance upon the appellants' promises. We conclude that this finding is well within the range of evidence establishing Petrade's loss as a result of its detrimental reliance on appellants' promises.

There was evidence that Petrade committed itself to buy gasoline from Gulf States in reliance upon its agreements with Adams and Box. Indeed, Petrade prepaid its oil purchase from Gulf States, and after Adams' and Box's promises, bought 100,000 barrels of gasoline in addition to the 100,000 barrels it had previously bought. Also in reliance, Petrade refrained from selling the gasoline it had already purchased, despite the declining market price. When Adams refused to honor his promise to sign the gasoline contracts and then pay for the product, Petrade could not honor its own obligations to buy from Gulf States. When Gulf States learned that Petrade could not perform its agreement to purchase gasoline, it refused to deliver the prepaid oil or to refund Petrade's money. Petrade lost $3.6 million it had already paid to Gulf States on oil that was never delivered.

Both sides contend, in essence, that the jury's findings on estoppel damages should be disregarded, but for different reasons. The appellants contend that the jury obviously misunderstood or misapplied the facts to the estoppel damages issues, and that there is no evidence to support the jury's calculation of damages on the reliance issues. On the other hand, the appellees simply argue that the court correctly awarded damages of $2,898,000, based on the difference on the contract and market price measure, and do not address the jury's award of damages relating to the reliance issues.

■ For the reasons stated earlier, we conclude that the trial court's award of damages based on the contract theory is erroneous and that the court should have awarded reliance damages in the amount found by the jury in answer to the promissory estoppel issues. Thus, the trial court should have awarded Petrade damages in the amount of $409,231, the sum the jury found would adequately compensate it for damages caused by its reliance on the appellants' promises. This amount is substantially less than the amount that the evidence shows that Petrade had already paid to Gulf States on oil for Adams that was never delivered as a consequence of Adams' breach of his promises and Petrade's resulting inability to honor its obligations to Gulf States. But in reviewing the adequacy of damages, we may not substitute our judgment for that of the jury. *See Eans v. Grocer Supply Co.*, 580 S.W.2d 17, 23 (Tex.Civ.App.—Houston [1st Dist.] 1979, no writ). The award is well within the range of reliance damages supported by the evidence presented on the issue. We note that Petrade merely asserts that the proper measure of estoppel recovery here is the difference between the

contract price and the market price and does not specifically complain by cross-point that the sum found by the jury in response to special issue 18 is against the great weight and preponderance of the evidence. In the absence of such a cross-point, we do not review or grant relief on that basis. *See Hall v. Hall*, 158 Tex. 95, 308 S.W.2d 12 (1957). Indeed, in a reply point, Petrade states that the court properly submitted special issues 13 through 19 and the accompanying instructions and definitions.

Neither are we permitted to disregard the jury's answers to the issues merely because the jury's reasoning in arriving at its figure may be unclear to us. The mental process by which a jury determines the amount of damages is ordinarily not cognizable by an appellate court. *Johnston Testers v. Rangel*, 435 S.W.2d 927, 933 (Tex.Civ.App.—San Antonio 1968, writ ref'd n.r.e.); *see Sumners Road Boring, Inc. v. Thompson*, 393 S.W.2d 690, 697 (Tex.Civ.App.—Corpus Christi 1965, writ ref'd n.r.e.). Where the law furnishes no precise legal measure for the recovery of damages, the amount to be awarded is largely discretionary. Recovery will not be denied merely because the exact amount of damage is incapable of being ascertained. *See Vance v. My Apartment Steak House*, 677 S.W.2d 480, 484 (Tex.1984); *Hamblet v. Coveney*, 714 S.W.2d 126, 132 (Tex.App.—Houston [1st Dist.] 1986, writ ref'd n.r.e.).

The trial court has broad discretion in submitting special issues to the jury, and we will not disturb its exercise of that discretion absent a clear showing of abuse. *Island Recreational Dev. Corp. v. Republic of Texas Sav. Ass'n.*, 710 S.W.2d 551 (Tex.1986); Tex.R.Civ.P. 277, 279. We find that special issue no. 19 should be disregarded. That issue, which was submitted unconditionally in connection with the promissory estoppel series of issues, resulted in the jury's finding that Petrade had actual "out-of-pocket" loss of $231,000 as a result of its detrimental reliance on the appellants' promises. We find that the ultimate issue on reliance damages under the promissory estoppel theory is repre-

sented by special issue no. 18, in which the jury determined the total amount of compensation to which Petrade was entitled, as damages for its loss in detrimental reliance on appellants' promises. The damages recoverable in cases of promissory estoppel are the amount necessary to restore the injured party to the position he would have been in had he not acted in reliance on the other party's promises. *Donaldson v. Lake Vista Community Improvement Ass'n*, 718 S.W.2d at 818. Trial courts are permitted to submit the controlling issues of a case in broad terms. *Island Recreational Dev. Corp. v. Republic of Texas Sav. Ass'n*, 710 S.W.2d at 554. Special Issue 19, which inquires about Petrade's "actual out-of-pocket loss," relates to only one element of Petrade's reliance damages under the promissory theory, and does not determine the ultimate question of total reliance damages. Again, we note that Petrade does not by cross-point complain about the form, manner of submission, or the evidentiary support for the damages issues submitted under the theory of promissory estoppel. We overrule the appellants' points of error relating to the issue of promissory estoppel damages.

Because the trial court's judgment is excessive in the amount of $2,488,769, we will modify the judgment by reducing that award to the promissory estoppel damages amount found by the jury, $409,231. Tex.R.App.P. 80(b).

We need not reach Box's points of error 42 through 61, or Adams' points of error 51 through 53, which either complain of or are premised upon a recovery by Petrade of contract damages. These points assert error in the court's instructions to the jury, in the failure to submit Box's issues, and in the insufficiency of the evidence to support Petrade's recovery of contract damages. Because we have held that Petrade failed to bind Box and Adams to a legally enforceable contract, but instead could only recover reliance damages on the theory of promissory estoppel, these points have become irrelevant. Box's points 42 through 61 and Adams' points 51 through 53 are overruled. We also need not reach Box's

points of error 93 and 94, complaining that the trial court awarded prejudgment interest on Petrade's contract damages recovery, or Petrade's cross-point six, complaining that the court should have awarded prejudgment interest of 10 percent rather than six percent on its contract damages recovery.

We next consider Box's points of error 62 through 85, and point 87, in which he challenges the admissibility, and the legal and factual sufficiency, of the evidence supporting the jury's finding of a partnership or joint venture between Adams and himself concerning the Petrade transactions.

▇▇ Box contends in point of error 78 that the court erred in denying his motion in limine to exclude evidence of his past petroleum-related partnerships or profit sharing arrangements with Adams. He contends that such evidence was irrelevant, prejudicial, remote in time, and therefore inadmissible. The record shows that Box did not object when Adams started to testify about these past oil partnerships, and in the absence of timely objection, any error in the admission of such evidence is waived. *Hartford Accident & Indem. Co. v. McCardell*, 369 S.W.2d 331, 335 (Tex.1963).

▇▇ We also overrule Box's point of error 87, in which he complains that the trial court erred in admitting evidence of the amount of profit received in his past petroleum profit sharing relationship with Adams. Again, we conclude that the complaint is waived by Box's failure to make a timely, specific ground of objection at time of trial.

▇▇ We also find that the evidence regarding the earlier partnership arrangements between Box and Adams was relevant and admissible on the question of the parties' general understanding, intent, and course of conduct in this transaction. *George Linskie Co. v. Miller–Picking Corp.*, 463 S.W.2d 170, 173 (Tex.1971); *see Allstate Ins. Co. v. Smith*, 471 S.W.2d 620, 625 (Tex.Civ.App.—El Paso 1971, no writ); *Page v. Hancock*, 200 S.W.2d 421, 424 (Tex. Civ.App.—Austin 1947, writ ref'd n.r.e.).

▇▇ Box contends, in point of error 86, that the court erred in allowing Petrade's counsel to question him about whether he had a motive to deny the existence of a partnership between him and Adams, because of the possible adverse legal consequences of such an admission. Over the objection of Box's counsel, Petrade's counsel was permitted to cross-examine Box regarding his use of corporate opportunities that afforded him, as an officer of OKC Corporation, the chance to make a personal gain through referring deals to Adams and splitting profits from such transactions. Box argues that this questioning was impermissible on the ground that evidence of an unproven criminal charge relating to an extraneous offense cannot be used to impair the credibility of a witness' testimony. *See Quesada v. Graham Ice Cream Co.*, 207 S.W.2d 120 (Tex. Civ.App.—Austin 1947, no writ).

We overrule this point of error. The thrust of the questions posed to Box were not directed to whether criminal charges were pending against him, but rather, the inquiry focused on whether Box had a strong motive to deny the fact of any partnership with Adams because of the possible adverse legal consequences of such an admission. Both Box and Adams were asked whether they knew that admitting to a partnership between them could have such consequences. The questioning was directed to Box's knowledge, concerns, and motives.

Generally, a party has the right to cross-examine an adverse party to show interest, bias, or prejudice that would affect the witness' credibility. Wide latitude is allowed in such cross-examination because the jury is entitled to know any relevant facts that would tend to influence the witness' testimony. *Turner, Collie & Braden v. Brookhollow, Inc.*, 624 S.W.2d 203, 208 (Tex.Civ.App.—Houston [1st Dist.] 1981), *rev'd in part on other grounds*, 642 S.W. 2d 160 (Tex.1982). The motives that operate on the mind of a witness are relevant and material, and the jury is entitled to know any fact that would tend to influence the witness' testimony. *Frank B. Hall &*

*Co. v. Buck,* 678 S.W.2d 612, 628 (Tex.App. —Houston [14th Dist.] 1984, writ ref'd n.r. e.), *cert. denied,* 472 U.S. 1009, 105 S.Ct. 2704, 86 L.Ed.2d 720 (1985).

We hold that the trial court did not abuse its discretion in allowing cross-examination of Box on his motives for denying the existence of a partnership.

■ We next consider Box's challenge to the legal and factual sufficiency of the evidence supporting the jury's finding that he and Adams were partners or joint venturers with respect to the alleged purchases of gasoline or fuel oil, and in the settlement of the fuel oil claims.

Both Box and Adams testified that before 1979, they had been partners for several years in various oil and products transactions, as well as horse breeding and cattle feeding ventures. Both claimed that those partnerships ended before 1979. In those partnership ventures, Box would refer someone who was interested in buying or selling oil or petroleum products to Adams, who would then try to make a profit on the transaction. Box did not contribute capital or otherwise participate in the deal after his initial referral to Adams, and the transactions were usually done in Adams' name or in the name of Adams' sole proprietorship, Adams Oil Company. There were no written agreements evincing these past relationships, and Box never received copies of any contracts. Under their arrangement, Box would share either profits or losses on the various transactions with Adams in a 50/50 split. There was evidence that Box made a profit of between four and five million dollars from these partnership ventures between 1974 and 1977. Adams admitted that Box played a similar role in the Petrade transaction, but both Box and Adams denied that they were still partners with respect to that transaction.

Steve Wyatt testified that he initially agreed with Box on the price, quantity, place, and time of delivery of 100,000 barrels of gasoline and 100,000 barrels of fuel oil that Petrade was to sell. He said that Box then told him that the oil and gasoline were to be sold to Adams, and that Box said, "We want to put this deal in J.R. Adams' name." On Box's instructions, Wyatt called Adams, who had talked with Box and was familiar with the terms. The paperwork on the deal was sent to Adams. Box arranged to have someone from his own company, OKC, help Adams schedule the delivery of the oil, and Box told Wyatt that he would arrange for "his" bankers to pay Petrade on June 27 for the fuel oil. When payment was not made on that date, Box told Wyatt that his bankers were out of town, but would be back in early July. When oil and gasoline prices fell sharply in June, Box told Wyatt that he "felt bad" about putting Adams into the deal and that he, Box, was going to take half the loss. Adams himself testified that he and Box had agreed to split the losses on the purchases from Petrade.

Oscar Wyatt testified by deposition that his son, Steve Wyatt, told him that he, Steve, had made a deal with Box and that he had sold Box fuel oil and gasoline. At trial, he testified that he spoke to Box in June 1979, after Steve had expressed concern about Petrade not being paid on the fuel oil and gasoline contracts. When Wyatt asked Box who Adams was, Box told him, "Mr. Adams is my partner in the oil and horse business."

Steve Wyatt also testified that at the meeting on July 2, 1979, when the fuel oil and gasoline contracts were presented for signature and payment, that Box did most of the talking and said, regarding the fuel contract, "*[W]e're* not going to pay you for this gasoline, because no one could take a loss like that." (Emphasis added.)

There was also testimony that Box, on two occasions in July, met with Petrade's representatives to discuss the transactions. Adams was not present on either occasion. At the second meeting, Box first contended that he had "nothing to do with" the Petrade deals, but after he was threatened with suit, he called Adams to talk about the problem. Box then said, "*[W]e* need to see what we can do about this." (Emphasis added.) Later, Box referred Adams to a bank in Dallas to finance the loss on the sale of fuel oil from Petrade, and eventual-

ly he referred Adams to his (Box's) attorney for assistance in handling the settlement agreement.

 A partnership is simply an association of two or more persons who, as co-owners, carry on a business for profit. Tex.Rev.Civ.Stat.Ann. art. 6132b, sec. 6(1) (Vernon 1970). A joint venture has similar aspects but is ordinarily limited to a particular transaction or enterprise. *North Texas Lumber Co. v. Kaspar,* 415 S.W.2d 470, 473 (Tex.Civ.App.—Dallas 1967, writ ref'd n.r.e.). Whether a particular relationship constitutes a partnership (or a joint venture) depends on the parties' intent, and each case must be evaluated according to its own circumstances. *Davis v. Gilmore,* 244 S.W.2d 671, 673 (Tex.Civ.App.—San Antonio 1951, writ ref'd). While the sharing of profits or losses does not necessarily, in itself, establish a partnership or joint venture, *see* Tex.Rev.Civ.Stat.Ann. art. 6132b, sec. 7(3), it is a factor to be weighed along with other indicia of such a relationship. Proof of the existence of a partnership or joint venture relationship may be based on testimony in the nature of a conclusion. *See Alstan Corp. v. Board of Admin. of Chimney Corners Townhouses,* 713 S.W.2d 130, 134 (Tex.App.—Austin 1986, writ ref'd n.r.e.); *Helbing v. Texas Dep't of Water Resources,* 713 S.W.2d 134, 136–37 (Tex.App.—Austin 1986, no writ).

Here, both Box and Adams admitted an ongoing relationship as partners in the petroleum field, and the continuation of that relationship was disputed only by their claim that they terminated their relationship before the Petrade transaction. The jury, as the sole judge of the credibility of the witnesses and the weight to be given their testimony, was not required to accept the explanation of Box and Adams, that their partnership or joint venture relationship had ended. *Rego Co. v. Brannon,* 682 S.W.2d at 680. We conclude that there is legally sufficient evidence to support the jury's finding that such a relationship did exist with respect to the Petrade transactions, and that the jury's findings are not so against the great weight and preponderance of the evidence as to be manifestly

wrong and unjust. We accordingly overrule Box's points of error 74, 75, and 77.

In view of our holding that the evidence is sufficient to support the jury's finding that Box and Adams were partners or joint venturers, it is unnecessary to discuss Box's complaints aimed at the jury's findings that Adams was Box's agent and that Box orally agreed to assume primary responsibility for Adams' alleged obligation to Petrade.

 We note, however, that there is legally and factually sufficient evidence to support the jury's findings on these issues, and that the jury's findings are not so against the great weight and preponderance of the evidence as to be manifestly wrong and unjust. In this respect, Steve Wyatt testified that when he asked about Adams' credit, Box told him "not to worry about credit, I guarantee his credit. In fact, I personally guarantee his credit." Petrade's president testified that Petrade agreed to put the transaction documents in Adams' name, only because he knew that Box was "behind" Adams. He said he did not require that Box sign a written guaranty, because "when you are dealing with the chairman of the board and chief executive officer of a New York listed company, it did not have to be in writing." Steve Wyatt also testified that in late June 1979, Box said "I just don't know about that gasoline. But I guarantee you a payment on that 2 oil."

 We also find that the jury was entitled to conclude from the evidence that a consideration existed for Box's alleged promise to pay the debt to Petrade, and that such consideration was Box's main purpose in agreeing to assume Adams' obligation as his own. The jury was entitled to consider the testimony that the deal was originally between Box and Petrade, and that at Box's insistence, the transaction was changed to Adams' name. It was also entitled to consider the testimony that it was Box who was really "behind" Adams. All of these circumstances were consistent with Box's intent to make a profit on the transaction, as he had done in prior profit sharing ventures with Adams. Therefore,

the jury could reasonably infer from the evidence that Box made the representations because he stood to benefit from the sale to his partner Adams, and that his share of the benefits accruing to the partnership was his "main purpose" for guaranteeing Adam's obligation. *See Gulf Liquid Fertilizer Co. v. Titus,* 163 Tex. 260, 354 S.W.2d 378, 382–83 (1962).

■ In points of error 76 and 80, Box contends that the court erred in holding that he was jointly liable with Adams for the alleged settlement of the fuel oil claims. He argues that the evidence is legally and factually insufficient to support the jury's findings that he and Adams were partners or joint venturers, or that Adams was Box's agent, with regard to the settlement transaction. We overrule these points. The jury found that Petrade had released, waived, and was estopped from asserting any claim against Box on the fuel oil dispute, and consistent with such findings, the trial court decreed liability only against Adams with respect to the settlement agreement. A party on appeal may not complain of action by the court that does not adversely affect him or that merely affects the rights of others. *Jackson v. Fontaine's Clinics, Inc.,* 499 S.W.2d 87, 92 (Tex.1973); *Providential Inv. Corp. v. Dibrell,* 320 S.W.2d 415, 418 (Tex.Civ.App.— Houston 1959, writ ref'd n.r.e.). Points 76 and 80 are overruled.

Box further complains in points of error 79 and 81 through 85, about the trial court's submission of the issues on agency relating to the gasoline sale transactions. He contends that there was no evidence or insufficient evidence to support the jury's finding that Adams acted as Box's agent in the transaction.

We overrule these points of error. We have previously held that the evidence supports the jury's findings that Box and Adams were partners, and Adams' acts, as an agent of the partnership in the gasoline transaction, are binding on the partnership and on Box as a partner. *MMP, Ltd. v. Jones,* 695 S.W.2d 208, 210 (Tex.App.—San Antonio 1985), *rev'd on other grounds,* 710 S.W.2d 59 (Tex.1986); *Boyd v. Leasing As-*

*soc., Inc.,* 516 S.W.2d 485, 489 (Tex.Civ. App.—Houston [1st Dist.] 1974, writ ref'd n.r.e.).

In Adams' points of error 8 through 20, and 38 through 43, he contends that the court erred in entering judgment against him on the alleged settlement agreement with Petrade.

In point 8, Adams claims that enforcement of the alleged settlement agreement is barred by limitations. In points 9 through 17, 19, and 20, he argues that the agreement (1) was a modification of a prior agreement for the sale of goods (subject to the statute of frauds, Tex.Bus. & Com. Code Ann. sec. 2–209 (Vernon 1968)); (2) was a contract for the sale of a chose in action (allegedly subject to the statute of frauds of Tex.Bus. & Com.Code Ann. sec. 1–206 (Vernon 1968)); (3) was made after threats of litigation (allegedly subject to Tex.R.Civ.P. 11's requirement of a signed writing); and (4) was not enforceable on a theory of promissory estoppel, because of an absence of the elements of reliance and injury.

■ We reject Adams' contention that Petrade's claim on the alleged settlement agreement was barred by limitations as a matter of law. Adams points out that the alleged settlement of the fuel oil claims occurred on July 12, or 13, 1979, and that Petrade did not assert a claim based on an oral settlement until December 7, 1983, more than four years later. But Petrade's original petition in this case was filed on July 30, 1979.

If an amended pleading relates to the cause of action asserted in the original petition that is not subject to limitations, then the amendment is also not barred by limitations. Tex.Civ.Prac. & Rem.Code Ann. sec. 16.068 (Vernon 1986). The test is whether the amended claim is wholly based upon a new, distinct, or different transaction or occurrence from the original suit. *Id.; Leonard v. Texaco, Inc.,* 422 S.W.2d 160 (Tex.1967). Here, if there had been no dispute about the transactions with Petrade, there would have been no oral settlement of any claims. The oral settlement claim relates to the aggregate of events

and dealings between the parties and is not based upon a wholly new, distinct, or different occurrence than the original suit. It is thus not barred by the statute of limitations. *See Leonard v. Texaco, Inc.,* 422 S.W.2d 160. Point of error 8 is overruled.

■ Adams contends in point of error 11 that the agreement was not enforceable because it was a settlement "made in anticipation of litigation." In support, he relies on the public policy underlying Tex.R.Civ. P. 11, which provides that an agreement "between attorneys or parties touching any suit pending" must be in writing to be enforceable. However, rule 11 "means precisely what it says," *Kennedy v. Hyde,* 682 S.W.2d 525, 529 (Tex.1984), and an oral settlement agreement made *prior* to the initiation of litigation is not subject to its provisions. Unless prohibited by some other rule or statute, such an agreement need not be in writing to be enforceable. *See Myers v. Thomas,* 502 S.W.2d 941, 943 (Tex.Civ.App.—Beaumont 1973, no writ) (release need not be in writing). Point of error 11 is overruled.

■ Next, Adams contends that the alleged settlement agreement was barred by the statute of frauds because it was a modification of a contract for the sale of fuel. Tex.Bus. & Com.Code Ann. secs. 2.201, 2.209. Section 2.209 provides that agreements modifying contracts must satisfy the statute of frauds of section 2.201 if the modified contract is within that section's provisions. Section 2.201 requires a writing for the sale of goods of $500 or more. If those sections do not apply, Adams argues that the settlement was the sale of a chose in action, required to be in writing by the "catch-all" provision, governing personal property, of section 1.206.

We do not construe the settlement agreement to be a modification, as contemplated by the Code, of a contract for the sale of goods. It is rather, the compromise of and release of Petrade's claims relating to certain disputes arising out of the parties' performance, or lack thereof, of obligations under the fuel oil contract. Chapter 2 of the Texas UCC is inapplicable.

■ Nor may the party's agreement be properly described as the sale of a chose in action, which is defined as the right, not yet reduced to possession by a lawsuit, to receive personal property in the future. *Black's Law Dictionary* 305 (4th ed. 1968). The settlement agreement represented the culmination of the parties' negotiations for the compromise of a dispute.

■ The law has always favored resolution of conflicts through compromise and settlement rather than litigation. *Hernandez v. Telles,* 663 S.W.2d 91 (Tex.App.—El Paso 1983, no writ). The Texas legislature has expressly declared the state's policy of encouraging the peaceable settlement of citizens' disputes, and has placed on the courts the responsibility for carrying out that policy. Tex.Civ.Prac. & Rem.Code Ann. secs. 154.002, 154.003 (Vernon Supp. 1988). Consistent with this policy, we hold that the statute of frauds in sec. 1.206 does not render the verbal settlement agreement in this case unenforceable. *See also Meyers v. Thomas,* 502 S.W.2d at 943.

Because we have found that the settlement agreement was enforceable, we need not reach Adams' points 13 through 17, and 41 through 43, which contend, alternatively, that the alleged settlement agreement could not be upheld on a theory of promissory estoppel. We also do not reach Adams' points of error 5 through 7, which concern deficiencies of performance by Petrade relating to the fuel oil contracts. Adams admits that the court did not award damages under these contracts. The court entered judgment on the agreement settling the fuel oil claims, and not on the underlying fuel oil contracts themselves.

Adams' points of error 5 through 7, 9, 10, 12 through 17, 19, 20, and 39 are overruled.

■ We also overrule Adams' points of error 18 and 38, which assert that there was no evidence or insufficient evidence of a meeting of the minds to establish a settlement contract. On a "no evidence" point, we consider only the evidence and inferences that tend to support the finding, and disregard the evidence to the contrary. *King v. Bauer,* 688 S.W.2d 845, 846 (Tex.

1985). On an "insufficient evidence" point, we review all the relevant evidence. *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660.

In special issue 32, the jury found that on July 12, 1979, a settlement agreement was made between Petrade and J.R. Adams, who was to pay Petrade $1.3 million for the release of his liability. The evidence supports this finding. Mr. Tracy Dubose, a founder and majority shareholder of Petrade who handled the company's legal and administrative matters, testified that a settlement agreement was "discussed and agreed to completely" with Box, and then adopted by Adams, on July 12, 1979. Dubose testified that he then spoke with Adams' lawyer, who was to draft a writing reflecting the agreement. A document was drafted that did reflect the terms that had been agreed upon, and that document was admitted into evidence. Adams and his attorney, on the other hand, testified that although there was initial agreement on the wording of the settlement draft, Adams then decided to add a clause covering Petrade's release of all gasoline claims, in addition to fuel oil claims, in return for the $1.3 million settlement amount. Adams stated that he would not have agreed to settle if only the oil claims had been covered.

We find that there is evidence of probative force to support the jury's finding, and that the finding is not so against the great weight and preponderance of the evidence to be manifestly erroneous. *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660. It is for the jury to judge the credibility and weight of the testimony. *Rego v. Brannon*, 682 S.W.2d at 680. We overrule Adams' points of error 18 and 38.

■ In Adams' points of error 35 through 37, he contends that the court erred in entering judgment on the alleged fuel oil settlement, because there was no evidence or insufficient evidence to support the jury's finding that Petrade had the ability to promptly deliver fuel oil to Adams. This point is based on Adams' statement in his brief, "the jury found in response to Special Issue 57 and 57a that

Adams was induced by a false representation to agree to modify the fuel oil contract."

Special issue 57 does not inquire about what induced Adams to settle (or "modify," as Adams describes it) the fuel oil contract, but rather about what induced him to sign the original fuel oil agreements on July 2, 1979. The jury found that Petrade represented that it had the ability to promptly deliver fuel oil to Adams, and that 25,000 barrels had already been shipped into the pipeline as of July 2, 1979. In special issue 57a, the jury found that the representation that 25,000 barrels had been shipped was false, but not the representation that Petrade had the ability to promptly deliver the No. 2 fuel oil.

Adams also asserts that the court erred in not submitting his special issue inquiring whether he was induced to settle by the misrepresentations that 25,000 barrels of fuel oil had been shipped and that Petrade had the ability to promptly deliver fuel oil.

We find that there is legally and factually sufficient evidence in the record to support the jury's finding. There was testimony that Petrade purchased an amount of No. 2 fuel oil from a supplier, Gulf States, to fulfill its contract with Adams and Box. Adams asserts that Petrade did not take actual delivery of any fuel oil and allegedly could not, because of its disputes with Gulf States. But there was evidence in the record that No. 2 fuel oil was available for delivery from Gulf States, and also that because the market had declined dramatically, Petrade could easily have supplied the oil from other sources if Gulf States had refused or failed to deliver. Adams' points 36 and 37 are overruled.

■ Adams requested a special issue asking the jury to determine whether he was induced to settle the fuel oil claims based on the misrepresentation that Petrade had the ability to deliver fuel oil to him. We find that any error in the trial court's refusal to submit this issue was harmless, because the jury found that there had been no misrepresentation of Petrade's ability to deliver fuel oil, and that

finding was supported by the evidence. Adams' point of error 35 is overruled.

In Adams' points of error 3 and 34, he contends that there was no evidence or insufficient evidence to show that there was a meeting of the minds on the gasoline contract, because the time of payment was uncertain. Adams contends that the industry standard for time of payment was payment upon invoice and supporting (delivery confirmation) documents, but that Petrade expected payment before delivery. Thus, he argues, there was not the required meeting of the minds on an essential term of the alleged contract. Box also complains, in his 13th point, that the court's charge did not define "agreement" to include a meeting of the minds.

Adams makes several factual statements relating to his point of error, but he does not make reference to the record or direct our attention to where the basis for his complaint might be found. *See* Tex.R. App.P. 74.

Because we have held that Petrade is entitled to recover on a theory of promissory estoppel, it is unnecessary that Petrade show that there was a meeting of the minds between the parties on all elements required to form a binding contract. However, even if such a finding were necessary, we find sufficient evidence to support that element of the contract.

In special issue 1, the jury found that there was an oral agreement between Adams and Petrade with respect to the purchase of 200,000 barrels of gasoline. The jury was instructed that

[t]here is an agreement between the parties when they express that there is a meeting of the minds as to the essential terms of the subject matter of their agreement. There must be an offer on one side that is accepted as to the essential terms, and such acceptance is communicated by the other side.

The determination of whether there was a meeting of the minds must be based on objective standards of what the parties said and did and not on their alleged subjective states of mind. *Slade v. Phelps*, 446 S.W. 2d 931, 933 (Tex.Civ.App.—Tyler 1969, no writ). Steve Wyatt testified that he and Adams agreed by telephone for the sale of 200,000 barrels of gasoline and that, in addition to quantity, they agreed on price, place, and date of delivery. Adams, however, testified that he never would have agreed to an advance payment contract. But when he defined, at trial, the essential elements of a "normal" transaction, Adams included quantity, price, delivery point, and delivery dates, but omitted any specific mention of payment terms. We find that there is sufficient evidence to support the jury's finding of a meeting of the minds on the essential terms of the agreement. Adams' points of error 3 and 34, and Box's point 13, are overruled.

In Adams' points of error 29 through 32, he contends that the court erred in not striking Petrade's amended petition after its Mary Carter settlement with Gulf States, in preventing Adams from discovering the full nature of the settlement, and in allowing Gulf States to participate in the lawsuit, because its only interest was by Mary Carter agreement with Petrade, and such agreements are void as against public policy. Petrade claims that its "Trial Simplification Agreement" with Gulf States was not a Mary Carter agreement at all, but rather a "mutual dismissal of the opposing claims each party had against the other."

A "Mary Carter" agreement is generally considered to be an agreement (1) settling a dispute between the plaintiff and one of two or more defendants; (2) retaining the settling defendant as a party in the trial; and (3) giving the settling defendant a financial interest in the plaintiff's recovery against the other defendant. *General Motors Corp. v. Simmons*, 558 S.W.2d 855, 857–58 (Tex.1977). Under the terms of the agreement between Petrade and Gulf States, Petrade released its claims to its $3.6 million paid to Gulf States for fuel oil that was never delivered, and also assigned to Gulf States 50% of its recovery against Box and Adams. In return, Gulf States released its claims against Petrade on the gasoline supply agreements that Petrade

could not honor. We find that this arrangement included the essential elements of a Mary Carter agreement, notwithstanding Petrade's own characterization.

■ There has been sharp criticism of Mary Carter agreements. *See, e.g., Scurlock Oil Co. v. Smithwick,* 724 S.W.2d 1, 8–12 (Tex.1986) (Spears, J., concurring). But the Texas Supreme Court has not held that such settlements are invalid, and we decline to do so here. It is not our role, as an intermediate appellate court, to make fundamental changes in the substance or application of the law. *Lynch v. Port of Houston Auth.,* 671 S.W.2d 954, 957 (Tex. App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.); *Bruno v. Bruno,* 589 S.W.2d 179, 180 (Tex.Civ.App.—Waco 1979, writ ref'd n.r.e.). That function is properly exercised by the legislature or the supreme court. Adams' point 32 is overruled.

■ The trial court has wide discretion in controlling and managing the conduct of a trial. *Schroeder v. Brandon,* 141 Tex. 319, 172 S.W.2d 488 (1943). This includes the decision to permit a party's pleadings to be amended. *See Vermillion v. Haynes,* 147 Tex. 359, 215 S.W.2d 605, 609 (1948); *see also* Tex.R.Civ.P. 63. We find no abuse of discretion in the protective order, in the court's denial of the motion to strike Petrade's amended pleadings, *Smith v. Smith,* 720 S.W.2d 586, 604 (Tex.App.— Houston [1st Dist.] 1986, no writ), or in its allowing Gulf States to participate in the trial as an assignee of half of Petrade's interest in the suit. *See Fort Worth & Denver Ry. Co. v. Ferguson,* 261 S.W.2d 874, 880 (Tex.Civ.App.—Fort Worth 1953, writ dism'd). Nor has Adams shown that any alleged error relating to the Mary Carter agreement amounted to such a denial of his rights as was reasonably calculated to and probably did cause the rendition of an improper judgment. Tex.R.App.P. 81(b). Points 29 through 31 are overruled.

■ In his points of error 54 and 55, Adams contends that he is entitled to receive a credit for the benefit received by Petrade from its settlement agreement with Gulf States. Adams claims that the court erred in not submitting his requested jury issue concerning this credit. He does not specify the amount of the credit he should receive or even the amount of benefit that he alleges Petrade received from the Gulf States settlement.

In support of his contention, Adams cites personal injury and DTPA cases governed by the "one satisfaction" rule. That is, the plaintiff was not allowed to recover double damages from joint tortfeasors or multiple defendants for a single injury. *E.g., T.L. James & Co. v. Statham,* 558 S.W.2d 865, 868 (Tex.1977); *Stendebach v. Campbell,* 665 S.W.2d 557 (Tex.App.—El Paso 1984, writ ref'd n.r.e.).

These cases are inapplicable to the present situation. Adams and Gulf States were not joint tortfeasors or jointly responsible for the same single injury to Petrade. Petrade's promissory estoppel recovery against Adams arose from a suit on a sales transaction between Adams and Petrade. The subject matter of the settlement between Petrade and Gulf States arose from a separate supply agreement between those parties. The mere fact that these transactions were related does not make them a single occurrence that caused a single injury to Petrade. Judgment for Petrade against Adams does not allow Petrade double recovery for the same wrong. Adams' points 54 and 55 are overruled.

■ Adams asserts in his points 44 and 45 that the trial judge improperly commented on the weight of the evidence and that his remarks to the jury led to the rendition of an improper verdict. Adams contends that the court compared the case to the *Texaco v. Pennzoil* case, and also that the court "instructed" the jury that the case involved a "sale," which, he claims, was a disputed issue in the case.

The trial judge made opening remarks to the jury, before voir dire, as follows:

THE COURT: Ladies and Gentlemen, I don't intend to get into any of the details of the case. I'm going to allow the attorneys from both sides to give you a brief preview of what they intend to prove in this case. This case involves the sale of a large amount of oil, which took place

back in 1979 or 1980 or back in that time period. And, the damages that are alleged in this particular case or the allegations of the damages that are involved are in millions of dollars. So, with that, I will allow the attorneys to introduce themselves and please, proceed.

Adams did not object to these remarks, and unless the remarks were so prejudicial that any error could not have been cured by an instruction, the complaint is waived. *State v. Wilemon*, 393 S.W.2d 816, 818 (Tex. 1965); Tex.R.App.P. 52(a).

We do not construe these remarks as a comment on the merits of the case. Contrary to Adams' contentions, the court did not "instruct" the jury that the case involved a "sale" (in general), but rather, that the case involved the "sale *of a large amount of oil.*" (Emphasis added.) It is undisputed that part of the dealings between Petrade and Adams and Box consisted of the sale of 100,000 barrels of fuel oil. Moreover, even if the remark was error, it was not one that could not have been rendered harmless by an instruction to disregard. *See MortgageAmerica Corp. v. American Nat'l Bank,* 651 S.W.2d 851, 858–59 (Tex.App.—Austin 1983, writ ref'd n.r.e.). Adams' points 44 and 45 are overruled.

Box and Adams both contend that the court erred in awarding attorney's fees to Petrade and Gulf States. In Box's points 88 through 92, and in Adams' points 46 through 50, they argue that there was no evidence or insufficient evidence of presentment of a claim by Petrade or Gulf States; that Gulf States had no right to attorney's fees; that Gulf States' claim for attorney's fees was barred by the statute of limitations; and that there was no evidence or insufficient evidence to support the jury's award of attorney's fees.

To recover attorney's fees under the statute, a claimant must "present" the claim to the opposing party or his agent. Tex.Civ. Prac. & Rem.Code Ann. sec. 38.002 (1986). The purpose of this requirement is to give the opposing party the opportunity to pay the claim within 30 days to avoid liability for attorney's fees, which are assessed as a type of penalty for the refusal to pay a just

claim. *See Jones v. Kelley,* 614 S.W.2d 95 (Tex.1981).

■ No particular form of presentment is required, *id.;* all that is necessary is that an assertion of a debt or claim and a request for compliance be made to the opposing party, and the failure of that party to render performance. *Huff v. Fidelity Union Life Ins. Co.,* 158 Tex. 433, 312 S.W.2d 493, 500 (1958). The statute is to be liberally construed. Tex.Civ.Prac. & Rem. Code Ann. sec. 38.005 (Vernon 1986).

■ At the meeting between Petrade and Box and Adams on July 2, 1979, Petrade's representatives presented Adams with the gasoline contracts and an invoice for 200,000 barrels of gasoline. Petrade had previously sent Adams a writing summarizing the terms of the gasoline purchase agreement and stating that payment was due upon presentation of invoice. We conclude that Petrade made a sufficient presentment for the purpose of obtaining attorney's fees. *See, e.g., Gensco, Inc. v. Transformaciones Metalurgicias Especiales,* 666 S.W.2d 549, 554 (Tex.App.—Houston [14th Dist.] 1984, writ dism'd) (presentation of invoices were probative to show presentment of the claim); *Roylex, Inc. v. Avco Community Developers, Inc.,* 559 S.W.2d 833, 838 (Tex.Civ.App.—Houston [14th Dist.] 1977, no writ) (sending invoices constitutes sufficient demand for payment). Because Adams was an agent of the partnership between himself and Box, no separate presentment to Box was necessary. Nor do we consider it dispositive, as Box contends, that there was evidence that Petrade did not "that day" expect payment of $10 million for the gasoline. *See King Optical v. Automatic Data Processing of Dallas, Inc.,* 542 S.W. 2d 213, 217 (Tex.Civ.App.—Waco 1976, writ ref'd n.r.e.) (oral request for payment and discussion of amount due, how it would be paid, and when, was sufficient presentment). All that is required is a request for payment and the failure to pay for 30 days thereafter.

■ Box also contends that Petrade did not make presentment on the cause of action upon which it prevailed, because it presented a claim for the contract price,

but only recovered damages based on the difference between the contract and market prices, which Box argues is a separate cause of action. However, the case cited in support of this assertion is distinguishable from the instant one. In *United States Steel Corp. v. Whitley*, 636 S.W.2d 465, 474 (Tex.App.—Corpus Christi 1982, writ ref'd n.r.e.), the court held that a claim for damages for the breach of an implied covenant to use due diligence in producing uranium was a separate cause of action from a claim for payment of royalties under the lease. Because the claimants did not present their due diligence claim, they could not recover attorney's fees on such a claim. Here, Petrade presented a claim for payment of the gasoline purchase agreement, sued on this claim, and was awarded a net recovery.

It does not matter that Petrade's final recovery is allowed on the theory of promissory estoppel. *See Preload Technology, Inc. v. A.B. & J. Constr. Co.*, 696 F.2d 1080, 1093–94 (5th Cir.1983) (attorney's fees allowed based on promissory estoppel recovery). Although we have found no Texas case addressing this particular situation, we note that the attorney's fees statute is to be liberally construed to promote its underlying purposes. Tex.Civ.Prac. & Rem.Code Ann. sec. 38.005. We hold that Petrade's presentment of its claim for the amount owed was sufficient to entitle it to recover attorney's fees in addition to its damages under the theory of promissory estoppel. Petrade was not required to make a presentment for the exact amount it was entitled to recover at trial. *See Findlay v. Cave*, 611 S.W.2d 57, 58 (Tex. 1981).

■ Box next contends that the presented claim of $10 million due on the gasoline agreements was excessive and in bad faith, because Petrade did not recover that amount at trial, but only the difference between the contract price and the market price. A creditor who makes excessive demand upon a debtor is not entitled to attorney's fees for subsequent litigation required to recover the debt. *Findlay v. Cave*, 611 S.W.2d at 58. But the mere fact that the jury awards an amount less than the original claim presented does not neces-

sarily mean that the original claim presented was excessive. *Id.* Indeed, in *Findlay*, the Texas Supreme Court upheld the award of attorney's fees even though the jury found that the amount due and presented under the original contract was unreasonable.

■ Here, the claim presented by Petrade was a contract and invoice for the exact amount agreed to for the purchase of the 200,000 barrels of gasoline. This case is distinguishable from those cited by Box in which some amount in excess of the debt, such as a "collection" fee, is demanded. *See id.; compare Collingsworth v. King*, 155 Tex. 93, 283 S.W.2d 30 (1955). We reject Box's contention that Petrade made a bad faith, and thus invalid, presentment.

■ No issue concerning presentment by either Petrade or Gulf States was requested or submitted to the jury. Box objected to the submission of issues 49 and 50, which inquired about the amount of reasonable attorney's fees, on the grounds that there was no evidence of presentment. But Box did not object to the omission of an issue on presentment. The trial court awarded attorney's fees to Petrade and Gulf States based on the jury's favorable answers to the special issues. The omitted issues on presentment will be deemed to have been found by the court to support the award of attorney's fees. *Atkin v. Cobb*, 663 S.W.2d 48, 53 (Tex.App.—San Antonio 1983, writ dism'd). We find that there is legally and factually sufficient evidence to support such deemed findings.

■ With regard to Gulf States' rights, we note that in Texas, all or part of a plaintiff's cause of action may be assigned. *Monk v. Dallas Brake & Clutch Service Co.*, 697 S.W.2d 780 (Tex.App.—Dallas 1985, writ ref'd n.r.e.). An assignee stands in the same position as the assignor, *see Houk v. Commissioner of Internal Revenue*, 173 F.2d 821, 825 (5th Cir.1949), and may assert only those rights that the assignor had. *See City of Taylor v. Hodges*, 143 Tex. 441, 186 S.W.2d 61 (1945). An assignee is also subject to any defenses, limitations, or setoffs that could be asserted against the assignor's rights. *De la*

*Fuente v. Home Sav. Ass'n,* 669 S.W.2d 137, 141 (Tex.App.—Corpus Christi 1984, no writ); *Glass v. Carpenter,* 330 S.W.2d 530, 537 (Tex.Civ.App.—San Antonio 1959, writ ref'd n.r.e.).

Petrade assigned to Gulf States one-half of its right to recover on all claims or causes of action against Box and Adams, excepting only Petrade's claims for costs and attorney's fees. Gulf States was thus the assignee of 50 percent of Petrade's claim on the gasoline debt, a type of claim for which attorney's fees could be recovered. Tex.Civ.Prac. & Rem.Code Ann. sec. 38.001. Any lack of presentment by Petrade could have been asserted as a defense against Gulf States, as Petrade's assignee, and conversely, Petrade's presentment of the gasoline claim also inured to its assignee's benefit. Therefore, Gulf States was not required to make a separate presentment of the claim to Adams and Box. Because Gulf States' claim for attorney's fees arose out of Petrade's claim on the gasoline transaction, which was timely asserted, it was not barred by limitations. Tex.Civ.Prac. & Rem.Code Ann. sec. 16.-068. Finally, we note that neither Box nor Adams raised or argued a point asserting that the total amount of attorney's fees awarded was excessive, so that contention is not presented for review.

Box's points of error 88 through 92, and Adams' points of error 46 through 50 are overruled.

■ In Adams' points 21 through 24, he contends that the court erred in admitting into evidence Adam's attorney's file notes summarizing telephone conversations with Adams and Petrade relating to settlement discussions. Adams argues that these were protected under the work product doctrine and under attorney-client privilege. He cites no authority in support of his contentions. Nor did Adams object to the admission of these exhibits at trial; he has thus waived his complaint. *Acord v. General Motors Corp.,* 669 S.W.2d 111, 116 (Tex.1984). Points 21 through 24 are overruled.

■ In points 25 and 26, Adams asserts that the court erred in severing his claim for indemnity or contribution from this law-

suit. He contends that severance constituted an abuse of discretion, because it amounted to splitting a single cause of action and because his indemnity claim was so intertwined with the settlement agreement issues as to be inseparable.

The trial court is given broad discretion in the consolidation and severance of causes, pursuant to Tex.R.Civ.P. 41. *Cherokee Water Co. v. Forderhause,* 641 S.W.2d 522, 525 (Tex.1982). Rule 41 provides that any claim against a party may be severed and proceeded with separately. The court's rulings on matters of severance will not be disturbed absent an abuse of discretion, prejudicial to the complaining party. *Womack v. Berry,* 156 Tex. 44, 291 S.W.2d 677, 682 (1956).

■ Adams asserts that his claim for indemnity was a compulsory counterclaim, cross-claim, and third party claim, and that severance of a compulsory counterclaim constitutes an abuse of discretion. *See Corpus Christi Bank & Trust v. Cross,* 586 S.W.2d 664, 667 (Tex.Civ.App.—Corpus Christi 1979, writ ref'd n.r.e.). However, a compulsory counterclaim is defined as a claim that the pleader has against any *opposing party,* if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim. Tex. R.Civ.P. 97(a). Adams' pleadings asserted a counterclaim against Petrade, its opposing party, for declaratory judgment regarding issues on the merits of Petrade's suit, but Adams' indemnity claim was asserted against Tracy DuBose, Bill Andrus, Jerry Evans, Oscar Wyatt, and Phoenix Petroleum Co., who were cross-claim defendants and third-party defendants and not Adams' opposing parties at the time. It was thus within the trial court's discretion to sever Adams' cross-claims and third-party claims, which were first asserted, also against new parties, within a few months before the case was set for trial, after it had been pending for six years. *See Ellisor v. Ellisor,* 630 S.W.2d 746, 748–49 (Tex.App.—Houston [1st Dist.] 1982, no writ).

■ Nor do we find merit in Adams' contention that his indemnity claim was not the proper subject of a separate lawsuit. A claim for indemnity or contribution is an

independent cause of action and may properly be asserted in a separate proceeding. *Union Bus Lines v. Byrd,* 142 Tex. 257, 177 S.W.2d 774, 776 (1944); *County of Nueces v. Svajda,* 608 S.W.2d 752, 753 (Tex.Civ.App.—Corpus Christi 1980, writ ref'd n.r.e.). Adams has also not shown that his indemnity claim was so intertwined with the settlement agreement issues that severance was improper. The substance of the controversy with Petrade was the existence of certain agreements between the parties. Adams' cross-claim and third-party claim, in contrast, asserted in addition to indemnity, issues such as the existence of a joint venture, between the cross-claim and third-party defendants, alter ego or individual liability for Petrade's corporate acts, de facto merger, and liability for denuding the corporation. Although there is some overlap in the proof of a settlement agreement and of indemnity for any liability on that settlement agreement, no issues defensive to Petrade's claims were raised, and the greater part of Adams' contentions would require proof of distinct and different elements than those required to be shown in Petrade's suit.

No abuse of discretion has been established. Adams' points of error 25 and 26 are overruled.

In points of error 27 and 28, Adams contends that the court erred in not severing Petrade's claims on the settlement agreement, because the jury probably considered the settlement agreement as evidence of liability on the underlying gasoline contracts. He also contends that the court erred in not instructing the jury to not consider the evidence relating to settlement as proof of liability on the underlying transaction.

Generally, evidence of offers of settlement or conduct in settlement negotiations is not admissible in a suit on the subject of the settlement. *See McGuire v. Commercial Union Ins. Co.,* 431 S.W.2d 347, 352 (Tex.1968); Tex.R.Evid. 408. Rule 408 of the Texas Rules of Evidence expressly provides that evidence of settlement offers or agreements is not admissible to prove liability for the settled claim.

However, rule 408 further states that exclusion of such evidence is not required when the evidence is offered for another purpose. Here, evidence relating to settlement discussions was not admitted to prove the merits of the underlying transaction, but instead was offered in support of Petrade's claim to enforce the settlement agreement itself. General contract principles are applicable to settlement agreements, and enforcement may be sought in a suit on the contract. *Browning v. Holloway,* 620 S.W.2d 611, 615 (Tex.Civ.App.— Dallas 1981, writ ref'd n.r.e.); *Stewart v. Mathes,* 528 S.W.2d 116, 118 (Tex.Civ.App.—Beaumont 1975, no writ). Evidence of settlement negotiations would be relevant and material to prove whether a valid settlement agreement was reached, and clearly admissible in a suit to enforce the settlement agreement. We now turn to whether the admission of this evidence was nevertheless prejudicial because the action to enforce the settlement agreement was tried in the same proceeding, before the same jury, that tried the claim on the alleged gasoline contract.

Adams asserts that the jury "probably" construed the evidence of the settlement agreement as proof of liability on the gasoline transaction. But he has not cited any specific part of the record that supports his assertion that the settlement evidence was used to show, or construed as showing, his liability on the underlying dispute. Although he claims that his own testimony, that he was at one time willing to settle, was prejudicial, we note that the main thrust of Adams' testimony was that he had agreed to settle *only* the fuel oil claims for $1.3 million. He testified that the settlement negotiations fell through because Petrade refused to include a release of any liability on the gasoline claims in the settlement, and Adams continuously insisted that he had not agreed to buy gasoline and was not bound on any gasoline contract. The claim on the settlement agreement pertained to Petrade's fuel oil claims, and the main action tried concerned the gasoline contract claims. Evidence of Adams' actions in relation to the settlement negotiations thus supports his position in the gas-

oline contract dispute, that no gasoline contract was ever concluded. Points 27 and 28 are overruled.

■ In five cross-points, Petrade contends that the court erred in not holding Box jointly and severally liable with Adams for the payment of $1.3 million under the settlement agreement. Petrade claims that there was no evidence to support the jury's findings that: (1) the terms of the settlement were that Box or OKC Corporation would purchase 100,000 barrels of No. 2 oil at $.80 per gallon, and that Adams [separately] would pay Petrade $1.3 million; and (2) Petrade released, waived, and was estopped from asserting its fuel oil claims against Box after the agreed purchase by Box or OKC of 100,000 barrels of fuel oil at an above-market price.

In reviewing a "no evidence" point, we consider only the evidence and inferences that tend to support the jury's findings, and we disregard all evidence and inferences to the contrary. *King v. Bauer*, 688 S.W.2d 845; *Garza v. Alviar*, 395 S.W.2d at 823. If there is any evidence of probative force to support the findings, we must uphold the findings. *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660. There is some evidence, more than a scintilla, if the evidence furnishes some reasonable basis for differing conclusions by reasonable minds about the existence of the vital fact. *Kindred v. Con/Chem. Inc.*, 650 S.W.2d 61, 63 (Tex.1983).

A release is the surrender of a cause of action and may be given for inadequate or no consideration. *Rexroat v. Prescott*, 570 S.W.2d 457, 459 (Tex.Civ.App.—Amarillo 1978, writ ref'd n.r.e.). A party may release one of several defendants, *id.*, and the release of a named party releases him and no others. *McMillen v. Klingensmith*, 467 S.W.2d 193, 196 (Tex.1971). A waiver is a voluntary, intentional relinquishment of an existing right or intentional conduct that is inconsistent with claiming that right. *United States Fidelity & Guaranty Co. v. Bimco Iron & Metal Corp.*, 464 S.W.2d 353, 357 (Tex.1971). A waiver results from a unilateral act, and no action by the opposite party is necessary to complete it. *Swiderski v. Prudential Property &*
*Casualty Ins. Co.*, 672 S.W.2d 264, 269 (Tex.App.—Corpus Christi 1984, writ dism'd). Finally, estoppel arises when by the words or actions of one person, another is induced to change his position to his detriment. *Id.*

We find that there is legally sufficient evidence to support the jury's answers to the settlement issues. There was testimony that conflict between Petrade and Box and Adams arose in July 1979, concerning the fuel oil and gasoline transactions. Representatives of Petrade became increasingly concerned about the delay in Petrade's being paid for the fuel oil it had agreed to sell, and Petrade called Box to tell him that Adams seemed to have a problem arranging financing or payment for the oil. Box assured Petrade that it would be paid, and that Adams was a man of his word. On July 11, Petrade's representatives met with Box and threatened to sue him after Box denied that he guaranteed payment. Steve Wyatt asked his father, Oscar Wyatt, to "help put the pressure on Mr. Box to pay [Petrade]." Box testified that he did not know who owned Petrade, but thought that Oscar Wyatt had money at stake, and that Petrade was "wasting Oscar's money." Box called Oscar Wyatt to explain his view of the situation, but Wyatt refused to let him talk about it, because he had "heard all about it." Box testified that Wyatt told him, "I know all about it, and I don't care what you say, you're going to get sued, if you don't help me get it straightened out." Box responded, "Oscar, I got other things to do, I don't want to be sued.... I started out helping your kid, I have done nothing, I have signed nothing, and nobody has been relying on me other than just carried [sic] water and trying to make some money for Steve. Now, you want to sue me." Box testified that when Oscar Wyatt told him that he was going to have "to do something," Box told Wyatt that he was not going to bear the entire burden. He also told Wyatt that he would like to do something and that he did not want to be sued.

Oscar Wyatt then proposed that Box or OKC Corporation buy some oil from Pe-

trade to give Petrade a profit in the amount of money that Petrade needed. Box testified that Wyatt said, "I tell you what you do, you get your boys [OKC] or your bunch to buy back this 2 oil, that these guys [Petrade] have got or pay them, for it, and give them a couple of months, and I will get you out of it. Then, I will take over and clean up the mess." Box agreed to the purchase of 100,000 barrels of oil at $.80 per gallon. He testified that it was his understanding that Petrade would release him if he bought that oil, that he would then be "forever out of it," and that he would not be sued. Box asked that Coastal (O. Wyatt's company) guarantee delivery of the oil, and Wyatt agreed.

On Wyatt's instructions, Box then called Tracy Dubose of Petrade, who had spoken with "Oscar and others" and knew everything that Box and Wyatt had discussed. Dubose wanted to send someone over to get the settlement check right away, but Box insisted on waiting until he received Coastal's guarantee of delivery.

There was also evidence that Box performed his agreement to buy 100,000 barrels of oil from Petrade at $.80 per gallon, and the supporting documents were admitted into evidence. The jury found that Petrade's profit on this transaction amounted to $189,000. Box testified that there was never any mention by Dubose of a two-part settlement or any further obligations of Box to Petrade. He was also not a party to negotiations between Petrade and Adams about payment for settling their dispute.

Box later called Adams and told him that he had settled with Petrade. He told Adams that if Adams had any negotiations with Petrade, Box did not want to interfere or get involved in any more details, and that Adams needed to get everything cleared up. Adams testified that he also spoke to Tracy Dubose "to work out a solution to the problem on the 2 oil, how much *I* could pay." Adams stated that negotiations reached a figure of $1.3 million "to get rid of this deal, and end it, because it had been a problem for me all the way through.... it was just a problem

... and *I* agreed to settle the matter and get it over with." Adams reiterated in testimony that the $1.3 million was to resolve any differences that existed "between Petrade and *myself.*"

The drafts of the settlement agreement covering the $1.3 million payment did not refer to Box at all: "[I]n further consideration of the payment by J.R. Adams to Petrade International, Inc. of One Million Three Hundred Thousand and No/100 Dollars ..., the undersigned Petrade International, Inc. and Steven Wyatt hereby release J.R. Adams and J.R. Adams Oil Co from any further obligations...." Petrade signed this draft of the settlement agreement. The attorney who assisted Adams in drafting a settlement agreement with Petrade testified that at no time did Dubose or Andrus of Petrade ever say or imply to him that Box was involved in the agreement to pay the $1.3 million. As discussed above, Adams did not pay the $1.3 million.

We conclude that there is legally sufficient evidence to support the jury's finding that the settlement obligations of Box and Adams were separate and not joint. *See Click v. Seale,* 519 S.W.2d 913, 918 (Tex. Civ.App.—Austin 1975, writ ref'd n.r.e.); *Coleman v. Ebeling,* 138 S.W. 199, 204 (Tex.Civ.App.—Austin 1911, no writ). There was evidence that Petrade treated Box and Adams separately with regard to the settlement, and that Petrade agreed on separate, distinct settlement obligations and consideration with Box and with Adams. It was also shown that there was a difference in the performance of these obligations—Box performed what he agreed to do and Adams did not. *See Click,* 519 S.W.2d at 918; *see also Smith v. Crosby,* 47 Tex. 121, 128 (1877). We therefore hold that the evidence was legally sufficient to support the jury's conclusion that Petrade released, waived, and was estopped from asserting its claims against Box, but not against Adams, on the fuel oil claims covered by the settlement agreement.

■ We find no irreconcilable conflict in the jury's refusal to hold Box liable on

the $1.3 million settlement and in its finding that Box and Adams were partners with regard to the settlement agreement. A party may release or waive its claims against one of multiple partners.

Because there was evidence to support the jury's findings, the trial court did not err in overruling Petrade's motion for judgment notwithstanding the verdict on the issue of Box's joint liability for payment of the $1.3 million settlement agreement. Petrade's cross-points 1 through 5 are overruled.

That part of the judgment that awards to Petrade and Gulf States recovery of $2,898,000 is reformed to award recovery of $409,231. Except as hereinabove reformed, the judgment is affirmed.

## ON MOTIONS FOR REHEARING

■ Box contends as he did in his initial submission, that Petrade was not entitled to a promissory estoppel recovery for the amount of its reliance damages found by the jury. Box argues that there was no evidence of any actual loss by reason of Petrade's reliance, and that any alleged loss related only to the fuel oil contract, which was not at issue in this appeal.

We overrule Box's contention. The jury found, in effect, that Box and Adams did not honor their agreement to buy gasoline, and that Petrade reasonably and detrimentally relied on the appellants' promises. When appellants refused to honor their promises, Petrade was forced to cancel its gasoline order from Gulf States. When Petrade cancelled the gasoline contract, Gulf States refused to deliver the prepaid fuel oil that Petrade had bought or to refund Petrade's prepayment. Thus, Petrade's loss was the direct result of the failure of Box and Adams to perform the gasoline contract. It is irrelevant that the amount paid by Petrade related to the fuel oil rather than the gasoline contract.

■ Box also complains of our determination that a deemed finding on the issue of presentment should be made in support of the court's award of attorney's fees. He argues that his "no evidence"

objection to the submission of the attorney's fee issue constituted an attack on the "heart" on any finding of presentment, which finding was necessary to support an award of attorney's fees. *See George S. May Co. v. Stephens Lumber Co.,* 301 S.W.2d 294, 297–98 (Tex.Civ.App.—Fort Worth 1957, no writ).

We overrule this contention. When one or more of a cluster of issues is submitted to the jury, and one issue relating to the cluster is omitted, the issue will be deemed found in such manner as to support the judgment. *Transport Insurance Co. v. Mabra,* 487 S.W.2d 704, 707–08 (Tex.1972); *see also Southwestern Bell Tel. Co. v. Thomas,* 535 S.W.2d 686, 695 (Tex.Civ.App.—Corpus Christi 1976), *rev'd on other grounds,* 554 S.W.2d 672 (Tex.1977). The deemed finding rule does not apply if there was a specific objection to the charge because of the failure to submit one of the cluster of issues. *Transport Insurance Co. v. Mabra,* 487 S.W.2d at 707. Here, no specific objection was made that the issue failed to include the element of presentment, and the "no evidence" challenge did not bring the asserted error to the attention of the trial court. *Id.* at 707–08.

Box further challenges the court's award of attorney's fees on the ground that the award is excessive. We note that Box's challenge on that particular ground is raised for the first time on rehearing. We consider that contention to have been waived.

Except as discussed herein, the remaining contentions asserted by Box, Adams, and the appellees in their respective motions for rehearing have been adequately discussed in our original opinion. The motions for rehearing are overruled.