The GREAT WESTERN SUGAR COMPANY, Plaintiff,

v.

LONE STAR DONUT COMPANY, Defendant.

Civ. A. No. CA 3–81–1429–G.

United States District Court,
N.D. Texas,
Dallas Division.

July 8, 1983.

---

M. David Bryant, Jr., Hughes & Hill, Dallas, Tex., for plaintiff.

Linda N. Coffee and Philip I. Palmer, Jr., Palmer, Palmer & Coffee, Dallas, Tex., for defendant.

## MEMORANDUM OPINION

FISH, District Judge.

The central question on defendant's motion for summary judgment is whether a letter prepared by plaintiff, which is denominated a written confirmation, operates to take the contract alleged to exist between the parties out of the statute of frauds, Tex.Bus. & Com.Code Ann. § 2.201(a) (Vernon 1968).

### Nature of the Dispute

Great Western Sugar Company (hereafter "GWS") complains that Lone Star Donut Company (hereafter "Lone Star") breached a contract that Lone Star would buy, and GWS would sell, 15,240 hundredweight of sugar during the months of December, 1980, and January, February and March of 1981 at a price of $42.22 per hundredweight. Lone Star has refused to purchase 9,780 hundredweight of this amount.

Lone Star's motion for summary judgment asserts in essence that (1) no contract between the parties was enforceable under the statute of frauds, and (2) no such contract was ever made because the letter from GWS to Lone Star purporting to confirm an oral agreement was, in fact, merely an offer which Lone Star never accepted. GWS counters that GWS's letter, although unsigned by Lone Star, confirmed the terms of an oral contract, and that since Lone Star failed to object in writing within ten days, the contract is fully enforceable under the "merchants' exception" to the statute of frauds, Tex.Bus. & Com.Code Ann. § 2.201(b) (Vernon 1968).

### Prior Dealings of the Parties

Since 1974 Lone Star had placed orders for its sugar requirements with GWS through a sugar broker, F.M. Lewis & Co., Inc. Although such sugar "bookings" from Lone Star were not committed to writing until October of 1980, GWS altered its booking practice at that time, first by requiring a form letter agreement, and later by changing the wording of the letter agreements mailed to customers.

By October of 1980, when Lone Star placed an order with Thomas B. Petty, a long-time employee of the broker, GWS had begun to require a letter agreement for each booking. In accordance with GWS's new policy, Petty forwarded to Jim Rader, Vice President of Lone Star, a form letter agreement prepared by GWS and dated October 9, 1980 (the 1980 letter agreement). It covered an amount of sugar to be delivered between October and December of 1980. This document concluded with the following paragraphs:

> This letter is a written confirmation of our agreement, and unless it is signed by the Buyer and returned to Great Western within 15 days from the date hereof, the agreement shall be deemed breached by Buyer and automatically terminated.

> Please sign and return to me the enclosed counterpart of this letter signalling your acceptance of the above agreement.

After altering the amounts indicated, Rader signed the letter and returned it. This 1980 letter agreement is not in dispute.

### Genesis of This Dispute

In early November, Rader contacted Petty to ask if GWS would agree to average the balance of the fourth quarter booking described above with 10,000 hundredweight for the first quarter of 1981. On December 2, 1980 Petty responded with GWS's proposal to average at $42.22 per hundredweight. The affidavits of both Rader and Petty agree that Rader expressed displeasure at this response, and that Rader later informed Petty that Lone Star "would ride with that price" until a letter agreement was sent. GWS neglected to send a letter

agreement until Petty prodded it to do so. Under cover letter of January 26, 1981, Petty finally forwarded GWS's letter agreement (the 1981 letter agreement) to Rader at Lone Star.[1] In contrast to the previous form, this one omitted the language of automatic termination. It concluded as follows:

> This letter is a written confirmation of our agreement. Please sign and return to me the enclosed counterpart of this letter signalling your acceptance of the above agreement.

Lone Star never signed this letter agreement. Both Rader and Petty agree that Rader informed Petty orally that Lone Star refused to sign the letter agreement because of the delay; Lone Star did not, however, express in writing its objections to the letter from GWS.

From March 6th to April 24, 1981, Lone Star made spot purchases from GWS, which ceased when Lone Star signed a letter agreement for sugar deliveries in the second quarter of the year.

### The Statute of Frauds and the Merchants' Exception

The provisions of Tex.Bus. & Com.Code Ann. § 2.201 (Vernon 1968) upon which the parties rely are the following:

(a) Except as otherwise provided in this section a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this paragraph beyond the quantity of goods shown in such writing.

(b) Between merchants if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the requirements of Subsection (a) against such party unless written notice of objection to its contents is given within 10 days after it is received.

GWS contends that this case presents a classic example of an oral contract between merchants involving the sale of goods for a price in excess of $500, confirmed by a writing sufficient against the sender. GWS maintains that since Lone Star failed to object within 10 days, under Subsection (b), the 1981 letter agreement may be enforced because it satisfies the requirements of Subsection (a), the statute of frauds.

### The 1981 Letter: Confirmation or Offer?

Although GWS's argument concerning the merchants' exception is superficially plausible, it is at odds with elementary principles of contract law. By requiring the buyer to take further action in order to signal acceptance (signing and returning a copy of the letter agreement), GWS indicated to the buyer in the 1981 letter agreement that the terms quoted were still subject to acceptance or rejection rather than representing a memorialization of an oral contract. A true confirmation requires no response. Having presented Lone Star with a renewed opportunity to weigh the benefits of a bargain and escape it, GWS cannot rely on the 1981 letter agreement to satisfy the requirements of the statute of frauds.

With reference to offer and acceptance, Tex.Bus. & Com.Code Ann. § 2.206 (Vernon 1968), in pertinent part, provides as follows:

(a) *Unless otherwise unambiguously indicated by the language* or circumstances

(1) an offer to make a contract shall be construed as inviting acceptance in any

---

1. Whether a letter mailed as a confirmation seven weeks after an alleged oral agreement is received within the "reasonable time" required under the merchants' exception, Tex.Bus. & Com.Code Ann. § 2.201(b) would be a fact question at trial.

manner and by any medium reasonable in the circumstances. [emphasis added]

██ Whether the 1981 letter agreement is ambiguous or not depends on whether it is reasonably susceptible to more than one meaning, in light of the surrounding circumstances and after applying established rules of construction. *Watkins v. Petro-Search, Inc.,* 689 F.2d 537, 538 (5th Cir. 1982); *Richland Plantation Company v. Justiss-Mears Oil Co.,* 671 F.2d 154, 156 (5th Cir.1982) (citing Texas decisions). Determining ambiguity is a question of law. *Id.* While the 1981 letter agreement, in contrast to the 1980 letter agreement, no longer specified that the agreement would be terminated if the buyer did not sign and return the copy, the only reasonable construction of GWS's requirement that the buyer signal acceptance is that if he failed to do so, he would not be bound.

In *Southwestern Stationery & Bank Supply, Inc. v. Harris Corp.,* 624 F.2d 168 (10th Cir.1980), the court had before it a purchase order signed by buyer and returned to seller, specifying that the order was subject to acceptance by the seller, who was to indicate acceptance by mailing the purchaser a signed duplicate copy. Seller did not sign the purchase order. The court concluded that read as a whole the purchase order was unambiguous in specifying the proper method of acceptance:

> The signature block clearly requires a Harris signature for the contract to be "hereby accepted." That language is subject to only one reasonable interpretation. *Southwestern Stationery, supra,* at 170.

The court denied the buyer recovery against the seller. The Court noted that under the Uniform Commercial Code parties retain their power to require specific methods of acceptance, citing to the Oklahoma equivalent of Section 2.206(a)(1) of the Texas Business & Commerce Code Annotated, *supra.*[2]

Dealing with a dispute over a tender offer, the court in *Kroeze v. Chloride Group,* 572 F.2d 1099, 1105 (5th Cir.1978) relied both on the common law and, by analogy, on Section 2.206(1)(a) of the Uniform Commercial Code. The court emphasized a cardinal rule of contracts, that the offeror is the master of his offer. He may prescribe as many conditions, terms or the like as he may wish, including but not limited to, the time, place and method of acceptance. The drafters of the U.C.C. explicitly recognized this principle, and it is embodied in Tex. Bus. & Com.Code Ann. § 2.206(a)(1), *supra.* In *Kroeze,* the court reasoned that because the offeror had expressly and unambiguously required signing of the transmittal letter to effect acceptance of the offer, the offerees who had not signed the transmittal letters could not recover.

In the case before this court, GWS has unambiguously indicated, by the language concluding the letter agreement, the manner and medium of acceptance: the buyer was to sign and return a copy. Although GWS asserts that Lone Star entered into an oral contract, this court need not decide that issue.

*Letters as Confirmation: Other Cases*

GWS cites two recent cases for the proposition that courts elsewhere have deemed letters with language similar to that of GWS's sufficient to constitute written confirmation of the transaction involved. In the first of these, however, *Luria Bros. & Co. v. Pielet Bros. Scrap Iron,* 600 F.2d 103 (7th Cir.1979), the "merchants' exception" was not central to the dispute. Each party had mailed a confirmation with somewhat different terms to the other. One of the forms stated "return acceptance copy immediately"; the court noted, however, that both parties to the alleged contract testified that in prior dealings, acceptance copies had not always been returned. *Luria, supra,* at 108 n. 2. The court may have construed this as a waiver. Furthermore, the sender of the form did not explicitly state, as in this case, that the recipient should sign the form to signify acceptance. In affirming, the court stated that a jury could readily

**2.** "Unless otherwise unambiguously indicated    by the language ...."

find that a contract existed between the parties because of conduct consistent with the existence of a contract, not because the confirmation copy which recipient never returned was sufficient against him. See *Luria* at 109. In the second case, *Transammonia Export Corp. v. Conserv, Inc.,* 554 F.2d 719 (5th Cir.1977), as in *Luria, supra,* each party had mailed to the other a written confirmation, and at oral argument the defendant dropped its statute of frauds defense. *Transammonia* at 722 n. 2. Neither *Luria* nor *Transammonia* lend palpable support to GWS's claim that its confirmation alone satisfied the statute of frauds.

### Summary Judgment Evidence: GWS's Policies

Furthermore, the affidavits of Rader and Petty, the parties to the alleged oral contract in this case, are in harmony. Each states that Rader expressed his displeasure at the $42.22 price. Rader states unequivocally that he did not agree on behalf of Lone Star to purchase 15,240 hundredweight at that price. Petty fails to state that Rader did so agree. To the contrary, Petty continues,

> It was my understanding from the fall of 1980 until late spring 1981 that if a customer did not accept a letter agreement sent to it by Great Western, then no obligation existed between the parties.

Nowhere does GWS or Petty assert that they informed customers of a new policy that bookings were to be binding when made.

Chuck Walton, who from 1979 to September, 1981 was an employee of GWS in charge of communicating with brokers, buttresses Petty's statements. By affidavit Walton states

> The Great Western Sugar Company began to require a form letter/contract to be signed by the customer for all contracts. It was my understanding that the policy from the sales department of the Great Western Sugar Company was that if the letter agreement/contract was not

signed by the customer, such agreement and/or contract was void. I communicated this understanding to my brokers, including F.M. Lewis & Co. in Dallas, Texas, during my employment with the Great Western Sugar Company.

Walton worked for GWS during the time that GWS was changing its booking procedure. His affidavit does not say whether GWS ever informed him, so that he in turn could inform the brokers, of any change in policy that modification of GWS's form letter was intended to effect. According to this record, the only policy Walton communicated to brokers required a customer signature to make a binding contract.

### Oral Contract

Even assuming that the parties entered into an oral contract as alleged, GWS prevented its writing from functioning as a confirmation of an oral contract under Tex. Bus. & Com.Code Ann. § 2.201(b), the "merchants' exception", by requiring that Lone Star sign and return the letter agreement to signal its acceptance. It is undisputed that Lone Star did not sign the letter agreement.

■ Whether an oral contract was in fact made is not a material issue of fact which would preclude the entry of summary judgment where, as here, there is no writing sufficient to satisfy the statute of frauds, Tex.Bus. & Com.Code Ann. § 2.201(a). *Hammonds v. Calhoun Distributing Co., Inc.,* 584 S.W.2d 473, 475 (Tex.Civ.App.— Texarkana 1979, writ ref'd n.r.e.). The oral contract, if any, is unenforceable as a matter of law.

### Depositions in Other Actions

GWS has objected to several items of the summary judgment evidence presented by Lone Star, specifically to depositions taken in former actions by GWS against its customers and to excerpts from transcripts of judicial proceedings in those cases.[3] In

---

**3.** *Great Western Sugar Co. v. Seven-Up Fort Worth Bottling Company, Inc.,* No. 3–82–0240– D, slip op. (N.D.Tex. Dec. 3, 1982) (partial summary judgment for defendant granted); *Great*

light of the court's conclusion that Lone Star is entitled to summary judgment on the express language of defendant's 1981 letter agreement, no ruling is required on these objections.

Summary judgment for defendant Lone Star is GRANTED.

Western Sugar Co. v. Oklahoma Beverages Co., No. 82–190–W, slip op. (W.D.Okla. Nov. 23, 1982) (judgment for defendant); Great Western Sugar Co. v. Lake Country Beverages, Inc., No. 82–C–180–C, slip op. (N.D.Okla. Oct. 18, 1982) (summary judgment for defendant granted); Great Western Sugar Co. v. Enzo Jel Co., No. 81–C–766, slip op. (E.D.Wisc. March 23, 1982) (partial summary judgment for defendant granted).