Argued and submitted October 28, 1994, affirmed April 12, petition for review
allowed July 18, 1995 (321 Or 396)

**GPL TREATMENT, LTD.,**
a corporation;
Scott Cedar Products, a division of
Green River Log Sales, Ltd., a corporation;
and Blackhawk Forest Products, Ltd.,
a corporation,
*Respondents,*

*v.*

**LOUISIANA-PACIFIC CORPORATION,**
a Delaware corporation,
*Appellant.*

(9209-06143; CA A81171)

894 P2d 470

634

John F. Neupert argued the cause for appellant. With him on the briefs were James N. Westwood and Miller, Nash, Wiener, Hager & Carlsen.

Jay W. Beattie argued the cause for respondents. With him on the brief was Lindsay, Hart, Neil & Weigler.

Before Riggs, Presiding Judge,* and De Muniz and Leeson, Judges.

De MUNIZ, J.

Leeson, J., dissenting.

---

* Riggs, P. J., *vice* Rossman, P. J., retired.

## De MUNIZ, J.

Plaintiffs are three separate wood products corporations owned and operated by members of the Clarke family, in British Columbia, Canada. Plaintiffs sued Louisiana-Pacific Corporation (L-P) to recover lost profits on alleged agreements by plaintiffs to sell 88 truckloads of cedar shakes to L-P. The jury returned a verdict for plaintiffs for the maximum amount of each plaintiff's prayer, and L-P appeals.

Plaintiffs Scott Cedar Products (Scott Cedar) and Blackhawk Forest Products, Ltd. (Blackhawk), manufacture and sell raw shakes and shingles. Plaintiff GPL Treatment, Ltd. (GPL), buys raw shakes, treats them, and sells them as "Class C" shakes. Treated shakes are packaged into bundles, with five bundles constituting a "square," and are often sold by the truckload. The price for cedar shakes fluctuates widely with market demand.

In early spring of 1992, a series of hailstorms in the Midwest caused an increased demand for cedar shakes and a concomitant increase in the price of Class C shakes. Plaintiffs' principal sales person, Gerry Feaver, visited with Dan Cunnally, a shake and shingle trader for L-P. Feaver testified that telephone conversations between the two led to a May 6, 1992, deal for L-P to purchase 66 truckloads of Class C shakes. He testified that he filled out and signed six of plaintiffs' "Confirmation Form" documents and sent to L-P the two top copies of each of six four-part documents.

In contrast, Cunnally testified that he made no commitment for L-P to purchase any product in any of the telephone conversations with Feaver; that he had told Feaver that the price was too high; and that L-P would not allow him to buy the volume of shakes that Feaver was offering to sell. Cunnally testified that he told Feaver that L-P would buy some shakes later and that Feaver understood that arrangement. Cunnally testified that he did not receive plaintiffs' "Confirmation Form" documents.

According to plaintiffs' evidence, plaintiffs became concerned in June 1992, when Cunnally did not ask for delivery of the shakes. Feaver testified that Cunnally had told him that L-P's customer in Dallas, Texas, was not using shakes as fast as anticipated. In the meantime, the market

price for shakes had dropped. Feaver testified that plaintiffs and Cunnally had additional conversations and negotiations about adjusting the volume and price of the order. Cunnally denied any such negotiations.

On about June 30 or July 1, Feaver was on personal business in eastern Canada, and Scott Clarke was in Portland visiting the office of Scott Cedar. Clarke testified that he took it upon himself to "finalize the deal with Mr. Cunnally." According to his testimony, he wrote a new order, revising prices and quantities for materials to be sold by plaintiffs to L-P. Clarke testified that the new order was firm, to accommodate L-P's needs. Clarke testified that Cunnally was "elated" with the new arrangement because it reduced the price.

Cunnally's testimony gives a different version of the conversation. He testified that Clarke called to try to sell more shakes to L-P, at specific quantities and lower prices than had been offered by Feaver, but that otherwise the arrangement was to be the same as it had been. Cunnally testified that he did not commit L-P to the purchase of shakes.

Clarke testified that, after working out the details of the revised order with Cunnally, he immediately telephoned Rick Sherneck in Canada and told Sherneck "to phone Dan Cunnally and confirm the order, then follow up with an order confirmation." Sherneck testified that Clarke instructed him, "We have a deal with L-P. I want you to write this down and then I want you to phone Dan Cunnally and confirm it with him."

Sherneck testified that he telephoned Cunnally, and confirmed the volumes and prices for the revised order in exact detail. He testified that he filled out order confirmation forms and put the top two copies of each form into the out basket for mailing to L-P. Cunnally testified that he remembers no such telephone call from Sherneck. He testified that he did not receive any writing from plaintiffs confirming any orders.

L-P took delivery of 13 truckloads of shakes in July 1992. According to plaintiffs, when L-P failed to give shipping instructions for an additional 75 truckloads of shakes, it became concerned. Feaver testified that he spoke to Cunnally

every day about why the shakes were not being delivered. Cunnally testified that he had no such conversations with Feaver, and that he was, in fact, out of town on vacation during that period of time.

On about August 1, 1992, plaintiffs inquired of L-P about a shipment schedule for an additional 75 truckloads of shakes that had allegedly been ordered by L-P. Plaintiffs sent a letter to L-P asserting an agreement for the delivery of 75 additional truckloads of shakes over a three-week period. L-P responded that the parties had no such agreement.

Plaintiffs brought this action to recover their respective profit losses on an alleged agreement to sell a total of 88 truckloads of cedar shakes to L-P. L-P claimed that it was responsible for only 13 truckloads, which were shipped and paid for. Plaintiffs claimed that L-P breached its agreement to accept the remaining 75 truckloads. L-P asserted as an affirmative defense that plaintiffs' claims are barred by the Statute of Frauds. The jury returned a verdict for the maximum amount of each plaintiff's prayer: $500,921 for GPL; $134,372 for Scott Cedar; and $106,984 for Blackhawk.

L-P assigns error to the trial court's denial of its motion to withdraw from the jury GPL's claim for lost profits, on the ground that there was an insufficient basis for estimating the amount of net profit with reasonable certainty. To recover for lost profits, a plaintiff must establish, with reasonable certainty, both the existence and amount of lost profits. *Pearson v. Schmitt*, 259 Or 439, 442, 487 P2d 84 (1971). Only net lost profit may be recovered. As the Supreme Court said in *Cont. Plants v. Measured Mkt.*, 274 Or 621, 624, 547 P2d 1368 (1976), and *Husky Lbr. v. D. R. Johnson Lbr. Co.*, 282 Or 481, 579 P2d 235 (1978), "reasonable certainty" signifies nothing more than "probability" and is found to refer to the kind of evidence required rather than the quantum of proof. In reviewing the trial court's denial of the motion to withdraw the issue of lost profits from the jury, the question is whether there was evidence in the record to permit a finding of *some* net lost profits. *Rennick v. Jackson & Coker*, 95 Or App 72, 74, 767 P2d 478 (1989); *see also Frogge v. U S West Communications, Inc.*, 120 Or App 619, 620, 853 P2d 1323, *on recon* 124 Or App 669, 863 P2d 1313 (1993), *rev den* 319 Or 36 (1994).

GPL claims that its lost profit on unshipped orders was $500,921. It supports that claim with testimony of its chief financial officer and two exhibits tracking his calculations, which were based on GPL's costs and the alleged agreed sale price for the unshipped shakes. L-P argues that GPL's listed costs for raw materials are grossly understated, that they are, in fact, Scott Cedar's cost for the raw logs. Yet, L-P contends, GPL's own cost of sales records reveal that Scott Cedar charged GPL market price for the shakes it sold to GPL for the L-P deal. L-P argues that, by plaintiffs' own computations, Scott Cedar's market prices for raw shakes were $118 per square for heavy shakes and $95 per square for light shakes, not the listed $54.56 and $47.01 per square. In its closing argument to the jury, L-P argued that the market cost was the appropriate raw material cost to be used in calculating any alleged lost profit.

It was for the jury to decide the exact amount of the lost profits, and we conclude that there was ample evidence from which the jury could make that determination, either by use of the figures provided by GPL or based on the market price, as argued by L-P. The trial court did not err in denying L-P's motion to take the issue of GPL's lost profits from the jury.

■ Before trial, L-P made a request for production of documents from plaintiffs. Inadvertently, when plaintiffs' legal counsel filed his response to the request, he also sent to L-P's counsel a facsimile cover sheet with a handwritten note by Sherneck to plaintiffs' legal counsel. The note stated:

"Attached find a page from [Feaver's] journal re the booking of the original orders and a page from my journal detailing [Scott Clarke's] call re the deal with L.P and J.E.H. Co."

L-P argues that, because Sherneck makes no mention in the note of his own alleged conversation with Cunnally, the inference is that he had no such conversation. L-P sought to introduce that note as evidence that Sherneck never called Cunnally. The trial court excluded the note as a privileged attorney-client communication protected from disclosure by OEC 503.[1] L-P concedes that the note is a privileged communication but argues that, by producing the note, although

---

[1] OEC 503(2)(a) provides, in part:

inadvertently, in the normal course of discovery, plaintiffs waived any attorney-client privilege pursuant to OEC 511.[2]

▮ Whether a party has waived the attorney-client privilege is a question of fact to be determined by the trial court pursuant to OEC 104.[3] *Goldsborough v. Eagle Crest Partners, Ltd.*, 314 Or 336, 342, 838 P2d 1069 (1992). Factors the court may consider include whether the disclosure was inadvertent, whether any attempt was made to remedy any error promptly and whether preservation of the privilege will occasion unfairness to the proponent. 314 Or at 342. The record indicates that the trial court considered statements from plaintiffs' counsel that the note had been inadvertently attached to other documents sent to L-P and that plaintiffs' counsel was not aware that the note had been sent or that L-P intended to offer it at trial until the day it was to be offered. The court found that there had been no voluntary disclosure. We conclude that the record supports the trial court's finding and its determination that there was no waiver of the attorney-client privilege, and that it did not err in excluding the handwritten note.

▮ In its third assignment of error, L-P contends that the trial court erred in denying its motions *in limine* and for a directed verdict on the ground that the alleged contract for the sale of shakes fails for noncompliance with Oregon's Uniform Commercial Code Statute of Frauds. Specifically,

---

"A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client:

"(a) Between the client * * * and the client's lawyer or representative of the lawyer[.]"

[2] OEC 511 provides, in part:

"A person upon whom [OEC 503 to 514] confer a privilege against disclosure of the confidential matter or communication waives the privilege if the person * * * voluntarily discloses or consents to the disclosure of any significant part of the matter or communication. This [rule] does not apply if the disclosure is itself a privileged communication."

[3] OEC 104(1) provides:

"Preliminary questions concerning the qualifications of a person to be a witness, the existence of a privilege or the admissibility of evidence shall be determined by the court * * *. In making its determination the court is not bound by the rules of evidence except those with respect to privileges."

the motions sought to exclude evidence of the written order confirmations that plaintiffs allegedly sent to L-P.

ORS 72.2010 provides, in relevant part:

"(1) Except as otherwise provided in this section a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by the authorized agent or broker of the party. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this subsection beyond the quantity of goods shown in such writing.

"(2) Between merchants, if within a reasonable time *a writing in confirmation of the contract and sufficient against the sender* is received and the party receiving it has reason to know its contents, it satisfies the requirements of subsection (1) of this section against such party unless written notice of objection to its contents is given within 10 days after it is received." (Emphasis supplied.)

Under subsection (2), the "merchants' exception" to the Uniform Commercial Code Statute of Frauds applies, when both parties to the transaction are merchants, if one merchant receives written confirmation of an oral contract from another merchant "sufficient against the sender," the contract becomes enforceable unless the recipient objects within 10 days. L-P argued to the trial court, and argues on appeal, that the order confirmations that plaintiffs allegedly sent to L-P are inadmissible as proof of the agreements and in satisfaction of the Statute of Frauds, because, *as a matter of law*, they are insufficient under ORS 72.2010 to constitute written confirmations of the contracts. The trial court held, as a matter of the law, that the documents were confirmations. The court submitted to the jury the factual questions of whether the confirmations were received by L-P, whether L-P knew their contents and whether L-P sent written notice of objection to plaintiffs. The assignment of error relates only to the trial court's ruling concerning the legal effect of the documents, *i.e.*, that they are, as a matter of law, sufficient to constitute "confirmations" under ORS 72.2010.

The printed order confirmation forms consist of four pages, one original page and three copies. The original and

first copy are sent to the buyer. Those two pages are, for the most part, identical. At the top left of both, in large print, is the name and address of the selling company. At the top right are boxes for the date and the seller's order number. Directly underneath those boxes, in large bold print, are the words "ORDER CONFIRMATION." The form contains two address blocks of three single-spaced lines each, encaptioned "SOLD TO" and "SHIP TO." Underneath those address blocks are three slim, long boxes of one line each for shipping instructions, terms of payment and the customer number. The largest part of the form, filling approximately one half the page, is for a description of the product, with a place to note FOB mill, freight and delivery price. At the bottom right of the form is the name of the selling company, and underneath it a signature line following the word "BY." Underneath that line are the words "THANK YOU."

The original and first copy differ in one respect. At the bottom left of the original, in small print, are the words:

"CONDITIONS OF SALES;

"All orders accepted subject to strikes, labor troubles, car shortages or other contingencies beyond our power to control. Any freight rate increases, sales or use taxes is for buyers account."

Then, beneath that block, in smaller print but highlighted, are the words: "SIGN CONFIRMATION COPY AND RETURN." At the bottom left of the first copy, the "confirmation copy," in small print, are the words: "ORDER ACCEPTED BY:," followed by a line for firm name. Below that is a line for a signature and the title of the person signing, and the date.

L-P concedes that the documents contain all the elements necessary to confirm an order. However, L-P contends that, by instructing the buyer to sign the confirmation copy on the "order accepted by" line and return that copy to plaintiffs, plaintiffs have indicated an intention that the agreement is to become final only after L-P's approval of the quoted terms.

Considering the document in its entirety, we conclude that it cannot reasonably be read as L-P suggests. The form is captioned "ORDER CONFIRMATION," boldly and

in large print. Unlike the forms involved in the cases relied on by the dissent, *see, e.g., Great Western Sugar Co. v. Lone Star Donut Co.*, 567 F Supp 340 (ND Tex), *aff'd* 721 F2d 510 (5th Cir 1983); *Kline Iron & Steel Co., Inc. v. Gray Com. Consultants, Inc.*, 715 F Supp 135 (DSC 1989), there is no language on this form, either on the original or the first copy, indicating that the parties are in the course of negotiations, that plaintiffs are merely proposing terms or that L-P must approve the terms. Every feature of the form suggests that it is what it is labeled, a confirmation and not a mere offer. We conclude that the sign and return instruction does not alter the apparent purpose of the document, to confirm in writing a completed agreement for the sale of shakes.[4] The trial court did not err in denying L-P's motions *in limine* and for a directed verdict.

Affirmed.

**LEESON, J.,** dissenting.

I disagree with the majority's conclusion that the documents allegedly sent by plaintiffs to L-P were sufficient to satisfy the UCC Statute of Frauds. The majority's opinion is at odds with courts from other jurisdictions that have ruled on facts similar to those in this case. Regrettably, it creates an "Oregon exception" to the uniformity that is one of the underlying purposes of the UCC. *See* ORS 71.1020(2)(c).

According to the majority, the forms sent by plaintiffs to L-P are writings in confirmation of a contract because they are labeled "ORDER CONFIRMATION" and because neither "the original" nor "first copy" contains any language "indicating that the parties are in the course of negotiations, that plaintiffs are merely proposing terms or that L-P must approve the terms." 133 Or App at 642. The majority goes to

---

[4] If there is anything uniform about the way courts have decided the question presented here, it is that each document must be evaluated independently and in the light of its contents, and that there is no single correct answer to the question of the effect of a "sign and return" provision. Contrary to the view expressed by the dissent, our opinion is consistent with that analysis and does not create an Oregon exception.

The dissent disapprovingly suggests that our opinion holds that the form sent to L-P is a confirmation because it is labeled "ORDER CONFIRMATION." That certainly is one significant consideration. It is not the exclusive one, however, the primary inquiry being whether the contents of the form show that it is what it is labeled. It seems that the dissent would cast aside those considerations in favor of a rule that when a form contains a "sign and return" clause it cannot, as a matter of law, be an order confirmation. That is most clearly wrong.

great lengths to describe the layout of those documents. Unfortunately, it does not analyze the import of the words used in them.

The majority's analysis begins incorrectly by characterizing the two parts of each form sent by plaintiffs to L-P as "the *original* and first *copy*." 133 Or App at 641. (Emphasis supplied.) All pages of the multi-copy form do not contain the same information. The top page plainly informs the prospective buyer that "[a]ll orders accepted subject to strikes * * * [and] other contingencies beyond our power to control" and instructs the buyer to "SIGN CONFIRMATION COPY AND RETURN." The confirmation copy (second page) provides a signature block for the recipient to comply with the instruction on the top copy:

"ORDER ACCEPTED BY: _____
                              FIRM NAME

_____
SIGNATURE AND TITLE              DATE"

Neither page is an "original." Neither is a "copy" of the other.

ORS 72.2010 is a verbatim enactment of the Statute of Frauds in Article 2 of the UCC. The official commentary to UCC 2-201 indicates that the writing need not be a complete memorial of the contract, as long as it affords a sufficient basis for believing that a contract has been made. *Tripp v. Pay 'n Pak Stores, Inc.*, 268 Or 1, 5, 518 P2d 1298 (1974). ORS 72.2010(2) eliminates the signature requirement when both parties are "merchants."[1] The official commentary explains that failure to answer a written confirmation within 10 days makes the writing sufficient against both parties under subsection (1). Under both subsections (1) and (2), the writing must evidence the existence of an agreement between the parties. Failure to respond to a merchant's confirming memorandum takes away from the nonresponding merchant the Statute of Frauds defense. To ultimately prevail, however, the sender still must show that an oral contract was in fact made prior to the confirming memorandum. Here, it is not

_____

[1] There is no dispute that all parties are "merchants" under the code. ORS 72.1040(1).

necessary to reach the issue of whether an oral contract was formed between the parties, because that contract would be unenforceable absent satisfaction of the Statute of Frauds. UCC § 2-201, *comment 3.*

The question of whether a writing satisfies the Statute of Frauds is a matter of law, to be determined from an examination of the writing itself.[2] *R.S. Bennett & Co. v. Economy Mech. Industries,* 606 F2d 182, 186 n 4 (7th Cir 1979); *Howard Const. Co. v. Jeff-Cole Quarries, Inc.,* 669 SW2d 221, 230 (Mo App 1983); *Bazak Intl Corp v. Mast Indus,* 73 NY2d 113, 118, 535 NE2d 633, 635 (1989); *Adams v. Petrade Intern., Inc.,* 754 SW2d 696, 705 (Tex App 1988). That a writing labels itself a "confirmation" is not determinative of whether it satisfies the merchants' exception. *Adams,* 754 SW2d at 706. Cases from other jurisdictions have directly addressed the use of a sign-and-return clause in a document that purports to be a "confirmation" under UCC section 2-201(2). In *Great Western Sugar Co. v. Lone Star Donut Co.,* 567 F Supp 340 (ND Tex), *aff'd* 721 F2d 510 (5th Cir 1983), for example, a sugar merchant brought a breach of contract action, claiming that a writing sent to the buyer, and denominated a "written confirmation," operated to take the alleged oral contract out of the UCC Statute of Frauds. The writing stated:

> "This letter is a written confirmation of our agreement. Please sign and return to me the enclosed counterpart of this letter signalling your acceptance of the above agreement." 567 F Supp at 342.

That trial court explained that the sugar merchant's argument concerning the merchants' exception:

> "is at odds with elementary principles of contract law. By requiring the buyer to take further action in order to signal

---

[2] Plaintiffs contend that the forms satisfy the merchants' exception, because the "sign and return" clause is "spurious language mostly ignored in the industry" and "absolutely irrelevant to the dealings between the parties." I would reject plaintiffs' attempts to explain the meaning of the forms with extrinsic evidence. Permitting parol evidence on this issue undermines the Statute of Frauds by allowing proof of an oral contract to explain a writing that itself is required to prove the existence of the oral contract. *Howard Const. Co. v. Jeff-Cole Quarries, Inc.,* 669 SW2d 221, 230 (Mo App 1983); *R.S. Bennett & Co. v. Economy Mech. Industries,* 606 F2d 182, 186 n 4 (7th Cir 1979).

acceptance (signing and returning a copy of the letter agreement), [the seller] indicated to the buyer * * * that the terms quoted were still subject to acceptance or rejection rather than representing a memorialization of an oral contract. *A true confirmation requires no response." Id.* (Emphasis supplied.)

The court held that, as a matter of law, the writing was not a "writing in confirmation" under UCC section 2-201(2). *Id.* at 342-43. The court of appeals affirmed:

"While a mere confirmation without timely objection might have been sufficient under the 'merchants exception,' the trial court correctly concluded that, as the master of its offer, [seller], *the sender, had the power to require written acceptance as a prerequisite to the formation of a contract. Since it did, and since none was given, no contract arose."* 721 F2d at 510-11. (Emphasis supplied.)

Courts in other jurisdictions have cited *Great Western Sugar* for the rule that a writing requiring the recipient to take further action by signing and returning a copy to the sender is merely an offer and, therefore, is not a confirmation of a prior oral contract under UCC section 2-201(2). *Kline Iron & Steel v. Gray Com. Consultants, Inc.*, 715 F Supp 135, 142 (D DC 1989); *Adams*, 754 SW2d at 706; *see also R.S. Bennett & Co.*, 606 F2d at 185-86; *Perdue Farms Inc. v. Motts, Inc. of Mississippi*, 459 F Supp 7, 15-17 (ND Miss 1978); *Howard Const. Co.*, 669 SW2d at 227; *Trilco Terminal v. Prebilt Corp.*, 167 NJ Super 449, 454-55, 400 A2d 1237, 1240 (Law Division 1979).[3]

---

[3] Plaintiffs cite *Bazak Intl Corp* for its holding that a buyer's written confirmation indicating that it was "ONLY AN OFFER AND NOT A CONTRACT UNLESS ACCEPTED IN WRITING BY THE SELLER" was, nevertheless, a writing in confirmation of an oral agreement within UCC section 2-201(2). However, that court acknowledged the general rule and distinguished the case on its peculiar facts. *Id.* at 123-24, 535 NE2d at 638. Plaintiffs also cite *Busby, Inc. v. Smoky Valley Bean, Inc.*, 767 F Supp 235 (D Kan 1991), for the proposition that highlighting of a "please sign and return" clause by the sender of a writing was insufficient to turn a written confirmation into an offer. In that case, however, the sender's written confirmation expressly stated that "receipt of this contract by the seller without written notice to us of objection or error within ten days is an acknowledgment of acceptance." *Id.* at 236. The court distinguished both *Great Western Sugar* and *Adams*, in which the recipients were required to take further action.

A thorough survey of relevant case law appears in *Annot.*, 82 ALR 4th 709 (1990), including Supp 10-14 (1994).

Despite being labeled "ORDER CONFIRMATION," plaintiffs' forms unambiguously require L-P to sign and return a "confirmation copy" on which it has signified its acceptance. That language indicates that plaintiffs were seeking agreement *from* L-P in order to form a contract, rather than merely providing confirmation *to* L-P of a previously concluded oral agreement. The forms require further action by L-P. Consistent with the rule in *Great Western Sugar*, I would hold that the writings offered by plaintiffs were merely offers to L-P to enter into a contract, and not a confirmation of a prior oral contract between them.

I would reverse the trial court's ruling that plaintiffs' forms constitute "writings in confirmation of a contract" under ORS 72.2010(2). Therefore, I would not reach the issues of lost profits and waiver of attorney-client privilege.[4]

I dissent.

---

[4] I would, however, address plaintiffs' cross-assignment that the trial court erred in refusing to apply the United Nations Convention on Contracts for the International Sale of Goods (CISG), 15 USCA App (Supp 1994), instead of the UCC. Article 11 of the CISG does not require a contract to be "evidenced by writing" and, thus, would defeat L-P's statute of frauds defense if the trial court abused its discretion under ORCP 23 B in ruling that plaintiffs' attempt to raise the CISG was untimely and that they had waived reliance on that theory.