Opinion issued February 26, 2003







  









 

In The
Court of Appeals
For The
First District of Texas




NO. 01-00-01250-CV




STANDARD CONSTRUCTORS, INC., Appellant

V.

CHEVRON CHEMICAL COMPANY, INC., Appellee




On Appeal from the 125th District Court of
Harris County, Texas
Trial Court Cause No. 98-29650




O P I N I O N

          In this breach of contract action, appellant, Standard Constructors, Inc.
(Standard), challenges a judgment entered after a jury verdict in favor of appellee,
Chevron Chemical Company, Inc. (Chevron). In three issues, Standard contends that
the trial court erred in (1) ruling, as a matter of law, that the contract unambiguously
barred Standard’s claim for “equipment overtime charges,” (2) excluding relevant
evidence, and (3) awarding Chevron interest and attorneys’ fees. We affirm.
Factual Background and Procedural History
          Standard, a construction company specializing in work at petrochemical plants,
provided construction, maintenance, and repair services at Chevron’s Cedar Bayou
refinery from the mid-1970s to 1997, when Chevron terminated its last contract with 
Standard. Standard had worked for Chevron under a series of one-year contracts, but,
in December 1994, the parties entered into a three-year contract, which is the subject
of this suit. Chevron entered into the three-year contract with Standard in order to
lock in Standard’s rates for personnel and equipment.
          A few weeks before the new contract took effect, the refinery was severely
damaged by a flood, and Standard was responsible for rebuilding approximately 33
buildings on an emergency basis. During the repairs, Chevron conducted a routine
audit of Standard’s billing. The initial audit revealed that Standard had overcharged
Chevron $97,784 for employee overtime. Standard admitted to overcharging
Chevron and agreed to repay Chevron for its mistake. However, after completing the
audit, Chevron claimed that Standard owed Chevron a total of $531,424, which
included the $97,784 and, by letter dated December 18, 1996, Chevron demanded
payment from Standard. Standard did not pay on Chevron’s demand, and Chevron
terminated the contract.
          Standard subsequently sent Chevron a bill for $647,666, claiming that from
April 1994 through March 1996 it failed to charge Chevron for “equipment overtime”
and that under the three-year contract, Chevron was responsible for the these charges. 
Chevron refused to pay on Standard’s demand.
          Standard then sued Chevron for (1) the equipment overtime, (2) its lost profits
from the premature termination of its exclusive contract, and (3) its attorneys’ fees. 
Chevron counterclaimed for breach of contract, demanding $97,784 as damages, and
its attorneys’ fees.



          Before the trial began, the trial court held an evidentiary hearing on the issue
of the contract’s ambiguity. The trial court ruled that the contract was unambiguous
and barred Standard’s claim for equipment overtime charges. The remaining issues
were tried to a jury. The jury determined that Standard did not have an exclusive
contract and awarded Chevron $97,784 in overcharges and $80,000 in attorneys’ fees. 
The trial court then rendered judgment on the verdict and added prejudgment and
post-judgment interest.
Contract Interpretation
          In its first issue, Standard contends that the trial court erred in ruling, as a
matter of law, that the three-year contract unambiguously barred Standard’s claim for
the previously unbilled equipment overtime.
          Whether a contract is ambiguous is a question of law for the court to decide.
See Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd., 940 S.W.2d 587, 589
(Tex. 1996); see also Nat’l Union Fire Ins. Co. v. CBI Indus., Inc., 907 S.W.2d 517,
520 (Tex. 1995); Markert v. Williams, 874 S.W.2d 353, 356 (Tex. App.—Houston
[1st Dist.] 1994, writ denied). We review questions of law de novo. See generally
El Paso Natural Gas Co. v. Minco Oil & Gas, Inc., 8 S.W.3d 309, 312 (Tex. 1999);
MCI Telecomm. Corp. v. Texas Util. Elec. Co., 995 S.W.2d 647, 651 (Tex. 1999);
Tex. Private Employment Ass’n v. Lyn-Jay Int’l, Inc., 888 S.W.2d 529, 531 (Tex.
App.—Houston [1st Dist.] 1994, no writ).
          The determination of whether a contract is ambiguous is made by looking at
the agreement as a whole in light of the circumstances present when the parties
entered into the contract. Nat’l Union, 907 S.W.2d at 520. We examine and consider
the entire writing in an effort to harmonize and give effect to all the provisions of the
contract so that none will be rendered meaningless. Id. No single provision will
control; rather, all the provisions must be considered with reference to the whole
instrument. Id.
          The primary concern of a court when construing a written contract is to
ascertain the true intent of the parties as expressed in the instrument. Id. If a written
contract is worded in a way that it can be given a definite or certain legal meaning,
then it is not ambiguous. Id. A contract will only become ambiguous if its meaning
is uncertain or it is subject to two or more reasonable interpretations. Id. An
ambiguity does not arise simply because the parties advance conflicting
interpretations of the contract. Forbau v. Aetna Life Ins. Co., 876 S.W.2d 132, 134
(Tex. 1994). 
          Chevron contends that the trial court did not err in ruling that the contract 
unambiguously precluded Standard from charging overtime for equipment used
during its construction and maintenance work. Conversely, Standard contends that 
the trial court erred in so ruling because the terms of the contract, specifically Exhibit
“F,” are ambiguous and that overtime charges for equipment are permitted under the
agreement.
          The contract provides, in pertinent part, as follows:
[Chevron] shall pay [Standard] a compensation in accordance with
attached Terms and Conditions, Exhibit “B” entitled “Compensation
Schedule”, and Exhibit “F” entitled “Contractor-Owned Equipment”.

Exhibit “F” was prepared by Standard and is a six-page list of different types of
equipment with corresponding billing rates in a format, reproduced in part, as
follows:
EXHIBIT “F”
CONTRACTOR - OWNED EQUIPMENT



Equipment Name

Hourly (1)

Daily (8) 

Weekly (40)

Monthly (176)



AIR COMPRESSOR

N/A

$35.00

$140.00

$420.00



AIR COMPRESSOR 100-600CFM

N/A

$150.00

$450.00

N/A



AIR DRILL

N/A

$20.00

$60.00

$180.00



AIR HOSE

N/A

$10.00

$30.00

N/A



AIR IMPACT WRENCH 3/4"

N/A

$24.00

$79.00

$169.00



AIR NAIL GUN

N/A

$40.00

$120.00

$360.00



AIR SPADE

N/A

$12.00

$16.00

$24.00



APPLIANCE DOLLY (HAND MULE)

N/A

$12.25

$36.75

$110.25



AUGER-GAS POWERED 12"

N/A

$100.00

$300.00

$900.00



BACKHOE-HITACHI 270

$38.00

N/A

N/A

N/A



BACKHOE-RUBBERTIRE 580K&E

$25.00

N/A

N/A

N/A




          For each piece of equipment, the chart provides a column for an “Hourly (1),”
“Daily (8),” “Weekly (40),” and “Monthly (176)” rate charge. Under the hourly
column, no hourly rate is specified for the vast majority of the equipment listed. 
Where no such rate is specified in the hourly column, the term “N/A” is used.


 For
example, in regard to ladders, the hourly column contains the term “N/A,” the daily
column reads “$17.95,” the weekly column reads “$53.85,” and the monthly column
reads “$161.55.” In some instances, a rate is specified in the hourly column, but the
term “N/A” is used in the daily, weekly, and monthly columns. For example, in
regard to a “Backhoe-Hitachi 270,” the hourly column provides a rate of “$38.00,”
but the term “N/A” is used in the daily, weekly, and monthly columns.
          Chevron contends that the term “N/A,” as it is used in the contract, “clearly
demonstrates [the parties’] intention that hourly rates were not to be applied—or
charged—for those items with an ‘N/A’ in their ‘hourly’ rate column, whether that
hourly rate would have been for ‘straight’ time or for ‘overtime.’”
          On the other hand, Standard contends that the abbreviation “N/A” should be
interpreted to mean variable or dependant. Standard argues that, because the contract
is silent regarding whether it could charge overtime for equipment, the contract is
ambiguous on its face and the abbreviation “N/A” means something other than its
natural definition.
          In support of its argument, Standard notes that the construction industry has
general practices that govern the rental rates of equipment. Standard directs us to the
Associated Equipment Distributors’ (AED) Green Book,


 which sets forth rental rates
for various types of equipment used in the construction industry. Standard maintains
that the Green Book explains how construction companies, like Standard, can charge
for overtime use of equipment.
          The Green Book is extrinsic evidence which was not expressly incorporated
into the parties’ contract. In Texas, extrinsic evidence is not admissible to contradict
or vary the meaning of unambiguous language in a written contract and may not be
considered by this Court in order to create an ambiguity. Nat’l Union, 907 S.W.2d
at 521-22 (holding evidence of industry-wide discussions inadmissible to demonstrate
intent behind unambiguous absolute pollution exclusion); Sears, Roebuck and Co. v.
Commercial Union Ins. Corp., 982 S.W.2d 151, 154 (Tex. App.—Houston [1st Dist.]
1998, no pet.). Rather, an “ambiguity must become evident when the contract is read
in context of the surrounding circumstances, not after parole evidence of intent is
admitted to create an ambiguity.” Nat’l Union, 907 S.W.2d at 521 (emphasis added). 
Only after a contract is first determined to be ambiguous may this Court then consider
the parties’ interpretations, through extrinsic evidence, of the contract. See
Friendswood Dev. Co. v. McDade + Co., 926 S.W.2d 280, 283 (Tex. 1996) (holding
only after contract is found to be ambiguous may parol evidence be admitted for
purpose of ascertaining parties’ true intentions).
          Here, a plain reading of the contract demonstrates the parties’ intention that
Chevron was not to be charged an hourly rate for Standard’s use of equipment listed
in Exhibit “F” with a “N/A” in its hourly column. In its brief, Standard concedes that:
On its face, [Exhibit “F”] simply provides fixed rates for Standard’s
equipment classified as “[H]ourly,” “[D]aily,” “[W]eekly,” and
“[M]onthly.” The “Daily” column has an “(8)” next to the word
“Daily,” which represents an 8-hour day. Similarly, the “(40)” in the
“Weekly” column and the “(176)” in the “Monthly” column represent a
40-hour week and a 176-hour month. Therefore, the daily rate was
based upon an 8-hour day, the weekly rate was based upon a 40-hour
week, and the monthly rate was based upon a 176 hour month. . . . That
much of the contract is indeed unambiguous.

(Emphasis added.) In regard to the use of equipment during regular hours, Chevron
would be charged $17.95 for the daily use of a ladder, based on an 8-hour day, but it
would not be charged for the hourly use of a ladder. The contract does not become
ambiguous in regard to the rates for overtime use of equipment merely because it does
not, on its face, address “overtime.”
          It makes sense that one might consent to paying $38.00 an hour for the use of
a backhoe, but would be unwilling to pay for the use of a ladder on an hourly basis. 
It also makes sense that some types of equipment, like a backhoe, may be available
for use only on an hourly basis and that the parties would agree that rates for daily,
weekly, and monthly use would not be applicable. It makes no sense that the term
“N/A” under the daily, weekly, and monthly columns for a backhoe would be subject
to only one meaning, i.e., “no rate charge,” but under the hourly column for a ladder
could be subject to two interpretations, i.e., “no rate charge” for use during regular
hours or “variable rate charge” in regard to overtime use.
          The dissenting opinion agrees with Standard’s argument that the term “N/A” 
should be interpreted in conjunction with the numbers (1), (8), (40), and (176), which
appear at the top of Exhibit “F.” The dissent points out that, in the Green Book, the
numbers (8), (40), and (176) have a distinct meaning within the construction industry
and quotes the Green Book regarding a calculation to be used in assessing charges for
the overtime use of rental equipment. It concludes that the Green Book’s
interpretation of the numbers (8), (40), and (176), as they were used in Exhibit F,
supports Standard’s construction that would allow it to charge overtime for
equipment usage and, thus, the contract is subject to two reasonable interpretations. 
          However, as noted above, extrinsic evidence, such as the Green Book, is not
admissible to contradict or vary the meaning of unambiguous language in a written
contract and it will not be considered by this Court in order to create an ambiguity. 
Nat’l Union Fire Ins., 907 S.W.2d at 521-22. Nevertheless, the Green Book provided
in the record simply does not discuss hourly rates or the term “N/A.” Nor does the
Green Book discuss numbers as placed beside the terms “Daily,” “Weekly,” and
“Monthly” or suggest that such placements manifest an intent that the contracting
parties have agreed to special compensation for overtime use of equipment. In fact,
the very language quoted by the dissenting opinion as demonstrating an ambiguity in
the contract applies to situations where “the equipment is rented.”


 Exhibit “F” is
entitled “CONTRACTOR-OWNED EQUIPMENT.”
          Whatever the substance and meaning of the provisions of the Green Book, the
parties in this case chose the language used in the contract.


 Standard prepared
Exhibit “F” and chose to use the term “N/A.” If Standard meant that the rates for
hourly overtime use of certain types of equipment to be “variable,” it could have used
that term or an asterisk with a simple explanation. A contract is not ambiguous
merely because a party believes the contract does not mean what it actually says.
          The term “N/A” has one clear, plain meaning throughout the chart labeled
Exhibit “F”–“no rate charge”–and is not ambiguous. Thus, we hold that the trial
court did not err in ruling that the contract unambiguously barred Standard’s claim
for payment for overtime use of equipment on an hourly basis.
          We overrule Standard’s first issue.
Exclusion of Evidence
          In its second issue, Standard contends that the trial court erred in excluding
relevant evidence. During Standard’s bill of exception, Bob Gulledge, Standard’s
president, testified that Richard Weaver, a Chevron representative, told him that
Chevron had forced him to fabricate its original claim for $531,424 in order to offset
Standard’s claim for equipment overtime charges. Specifically, Gulledge stated, 
He [Weaver] told me that he just wanted to let me know before he left
that the $531,000—that the bulk of, that $531,000 was not owed to
Chevron—I mean, not owed by us to Chevron. . . . He just said the bulk
of it was thrown in there to counteract equipment.

          Chevron objected to Gulledge’s testimony on the grounds that it was irrelevant
and any probative value was outweighed by its potential prejudicial effect. See Tex.
R. Evid. 401, 402, 403. Standard argues that this “admission” was relevant to show
why it was excused from repaying Chevron the $97,784.
          The decision to exclude evidence is reviewed under an abuse of discretion
standard. City of Brownsville v. Alvarado, 897 S.W.2d 750, 753 (Tex. 1995). A court
abuses its discretion only when it acts in an unreasonable and arbitrary manner, or
when it acts without reference to any guiding rules and principles. E.I. du Pont de
Nemours and Co., Inc. v. Robinson, 923 S.W.2d 549, 558 (Tex. 1995); Downer v.
Aquamarine Operators, Inc., 701 S.W.2d 238, 241-42 (Tex. 1985). This Court may
not reverse a trial court’s ruling for an abuse of discretion merely because we disagree
with its decision. See Robinson, 923 S.W.2d at 558; Downer, 701 S.W.2d at 242.
          In addition to showing an abuse of discretion, Standard must also show that the
trial court’s error was reasonably calculated to cause, and probably did cause, the
rendition of an improper judgment. See Tex. R. App. P. 44.1; see also Alvarado, 897
S.W.2d at 753-54; GT & MC, Inc. v. Tex. City Ref., Inc., 822 S.W.2d 252, 257 (Tex.
App.—Houston [1st Dist.] 1991, writ denied). In other words, the “judgment [must]
turn[] on the particular evidence excluded.” Alvarado, 897 S.W.2d at 753-54.
          Here, Gulledge’s testimony was not relevant to Standard’s claim that it was
“excused” from reimbursing $97,784 to Chevron. The pertinent jury question read
as follows:
Do you find from a preponderance of the evidence that on or
before February 19, 1997, Standard was excused from repayment to
Chevron of the $97,784 over-billing?
 
You are instructed that Standard’s failure to repay the
$97,784 was excused only if you find that Chevron clearly
indicated to Standard that any tender of repayment by
Standard of $97,784 would be refused.
 
Answer “Yes” or “No” in the space below.
Answer: NO .
(Emphasis added.)



          Gulledge’s proffered testimony was irrelevant to the issue before the jury. 
Evidence is only relevant if it has “any tendency to make the existence of any fact
that is of consequence to the determination of the action more probable or less
probable than it would be without the evidence.” Tex. R. Evid. 401 (emphasis
added). Here, even if Gulledge’s testimony was true, it would not have provided
Standard with a legal “excuse,” as defined by the jury charge, to forego reimbursing
$97,784 to Chevron. As noted above, Chevron originally alleged that Standard owed
Chevron a total of $531,424. However, Chevron non-suited its claim for $433,640,
leaving only its claim for the $97,784 reimbursement. Thus, the issue of whether
Chevron created a bogus bill for $433,640 is irrelevant to the current litigation. As
noted by the trial court,
But he acknowledges—Mr. Gulledge acknowledges that—he did
acknowledge that the same portion was going to include the $97,000
was, in fact, appropriate for payment. And so, what you’re asking me
to let the jury hear is a conversation pursuant to which Mr. Weaver is
apparently saying that we have, in effect, a bogus bill. It doesn’t help
us with that part of the bill [the $97,784], the charges that aren’t
[unsubstantiated].
(Emphasis added.)
          We hold the trial court did not abuse its discretion in excluding, as irrelevant,
Gulledge’s proffered testimony as indicated above.
          We overrule Standard’s second issue.Attorneys’ Fees and Interest
          In its third issue, Standard argues that the trial court erred in awarding Chevron 
attorneys’ fees and prejudgment interest because Chevron made no pretrial demand
on Standard specifically for reimbursement of the $97,784 in overcharges for
overtime, and Chevron’s initial demand for payment of $531,424 was excessive and
made in bad faith. Standard also contends that post-judgment interest should be
deleted from the judgment.
Attorneys’ Fees
          In order to recover attorneys’ fees under chapter 38 of the Civil Practice and
Remedies Code, a claimant must comply with the following requirements:
(1)the claimant must be represented by an attorney;
 
(2)the claimant must present the claim to the opposing party or to a
duly authorized agent of the opposing party; and
 
(3)payment for the just amount owed must not have been tendered
before the expiration of the 30th day after the claim is presented.

Tex. Civ. Prac. & Rem. Code Ann. § 38.002 (Vernon 1997) (emphasis added);
Hermann Hosp. v. Vardeman, 775 S.W.2d 866, 868 (Tex. App.—Houston [1st Dist.] 
1989, no writ). No particular form of demand or presentment is required. Jones v.
Kelley, 614 S.W.2d 95, 100 (Tex. 1981); Adams v. Petrade Int’l, Inc., 754 S.W.2d
696, 719 (Tex. App.—Houston [1st Dist.] 1988, writ denied).
          Standard argues that “because Chevron never demanded the $97,784 until trial
began, Standard had no chance to avoid litigation.” However, in a letter dated
December 18, 1996, Chevron presented Standard with a demand for payment of
$531,424. It is undisputed that Chevron’s claim for reimbursement of $97,784 for
overtime overcharges was included as part of that demand. Bob Gulledge, Standard’s
president, described the December 18th demand as “a one-page letter . . . saying that
we owed them [Chevron] $531,000,” and stated that he refused to pay the amount
because there was no substantiation for it. As noted above, section 38.002 does not
require any particular form of presentment; all that is necessary is that a party show
that its assertion of a debt or claim and a request for compliance was made to the
opposing party, and the opposing party refused to pay the claim. Panizo v. Young
Men’s Christian Ass’n of the Greater Houston Area, 938 S.W.2d 163, 168 (Tex.
App.—Houston [1st Dist.] 1996, no writ). Thus, Standard’s argument that it was
never properly presented with Chevron’s demand is without merit.
          Standard next contends that Chevron was precluded from recovering attorneys’
fees and prejudgment interest because Chevron’s demand was excessive and made
in bad faith. As a general rule, a creditor who makes an excessive claim upon a
debtor is not entitled to attorneys’ fees for subsequent litigation required to recover
the debt. Findlay v. Cave, 611 S.W.2d 57, 58 (Tex. 1981). A claimant is not required
to make a presentment for the exact amount it is entitled to recover at trial. Panizo,
938 S.W.2d at 169. The dispositive question in determining whether a demand is
excessive is whether the claimant acted unreasonably or in bad faith. Id.
          Standard argues that Chevron’s demand was unreasonable and made in bad
faith because (1) its supervisor of purchasing contracts told Bob Gulledge that its
claim for $531,424 was fabricated to offset Standard’s claim, and (2) Chevron never
provided supporting documentation for its demand. In essence, Standard is arguing
that Chevron, as a matter of law, was precluded from recovering attorneys’ fees and
prejudgment interest. However, there was no jury finding that Chevron acted in bad
faith. From the record before us, we cannot conclude that Chevron’s conduct in
making its initial demand of $531,424 and subsequently proceeding to trial solely on
its claim for $97,784 constituted bad faith as a matter of law.



          Additionally, a party must affirmatively assert excessive demand as a defense
to a claim for attorneys’ fees. Essex Crane Rental Corp. v. Striland Constr. Co., Inc.,
753 S.W.2d 751, 758 (Tex. App.—Dallas 1988, writ denied); Tuthill v. Southwestern
Pub. Serv. Co.,614 S.W.2d 205, 212 (Tex. App.—Amarillo 1981, writ ref’d n.r.e.). 
Furthermore, that party must request and obtain findings of facts on the essential
elements of excessive demand. Essex, 753 S.W.2d at 758; Tuthill,614 S.W.2d at 212. 
Standard has failed to do both.
Post-Judgment Interest
          Finally, Standard argues that Chevron should not receive post-judgment
interest because Standard was “willing to tender payment of the entire $97,784” to
Chevron after the judgment was signed. However, the record demonstrates that
Standard never actually tendered payment of the $97,784 to Chevron or deposited
that amount into the registry of the trial court in lieu of an appeal bond. See Tex. R.
App. P. 24.1, 24.2. Thus, Standard’s argument is without merit.
           We overrule Standard’s third issue.
 

Conclusion
          We affirm the judgment of the trial court.
 
 
                                                                        Terry Jennings
                                                                        Justice

Panel consists of Justices Hedges, Jennings, and Mirabal.




Justice Mirabal dissenting.